COMMISSIONER OF INTERNAL REVENUE *v.* INDI-
ANAPOLIS POWER & LIGHT CO.

No. 88–1319.   Argued October 31, 1989—Decided January 9, 1990

BLACKMUN, J., delivered the opinion for a unanimous Court.

*Deputy Solicitor General Wallace* argued the cause for
petitioner.   With him on the briefs were *Solicitor General*

*Starr, Acting Assistant Attorney General Knapp, Alan I. Horowitz, Jonathan S. Cohen,* and *William A. Whitledge.*

*Larry J. Stroble* argued the cause for respondent. With him on the brief was *Stanley C. Fickle.**

JUSTICE BLACKMUN delivered the opinion of the Court.

Respondent Indianapolis Power & Light Company (IPL) requires certain customers to make deposits with it to assure payment of future bills for electric service. Petitioner Commissioner of Internal Revenue contends that these deposits are advance payments for electricity and therefore constitute taxable income to IPL upon receipt. IPL contends otherwise.

## I

IPL is a regulated Indiana corporation that generates and sells electricity in Indianapolis and its environs. It keeps its books on the accrual and calendar year basis. During the years 1974 through 1977, approximately 5% of IPL's residential and commercial customers were required to make deposits "to insure prompt payment," as the customers' receipts stated, of future utility bills. These customers were selected because their credit was suspect. Prior to March 10, 1976, the deposit requirement was imposed on a case-by-case basis. IPL relied on a credit test but employed no fixed formula. The amount of the required deposit ordinarily was twice the customer's estimated monthly bill. IPL paid 3% interest on a deposit held for six months or more. A customer could obtain a refund of the deposit prior to termination of service by requesting a review and demonstrating acceptable credit. The refund usually was made in cash or by check, but the cus-

---

*Briefs of *amici curiae* urging affirmance were filed for American Information Technologies Corporation et al. by *Jerome B. Libin, Bradley M. Seltzer, Jim J. Kilpatric,* and *Lawrence H. Cohen;* for El Paso Electric Company by *Stephen R. Nelson;* for Oak Industries, Inc., and Subsidiaries by *John P. Warner* and *Samuel M. Maruca;* and for Wisconsin Electric Power Co. and Affiliated Companies by *Joseph E. Tierney, Jr.,* and *Margaret T. Lund.*

tomer could choose to have the amount applied against future bills.

In March 1976, IPL amended its rules governing the deposit program. See 170 Ind. Admin. Code § 4–1–15 (1988). Under the amended rules, the residential customers from whom deposits were required were selected on the basis of a fixed formula. The interest rate was raised to 6% but was payable only on deposits held for 12 months or more. A deposit was refunded when the customer made timely payments for either 9 consecutive months, or for 10 out of 12 consecutive months so long as the 2 delinquent months were not themselves consecutive. A customer could obtain a refund prior to that time by satisfying the credit test. As under the previous rules, the refund would be made in cash or by check, or, at the customer's option, applied against future bills. Any deposit unclaimed after seven years was to escheat to the State. See Ind. Code § 32–9–1–6(a) (1988).[1]

IPL did not treat these deposits as income at the time of receipt. Rather, as required by state administrative regulations, the deposits were carried on its books as current liabilities. Under its accounting system, IPL recognized income when it mailed a monthly bill. If the deposit was used to offset a customer's bill, the utility made the necessary accounting adjustments. Customer deposits were not physically segregated in any way from the company's general funds. They were commingled with other receipts and at all times were subject to IPL's unfettered use and control. It is undisputed that IPL's treatment of the deposits was consistent with accepted accounting practice and applicable state regulations.

Upon audit of respondent's returns for the calendar years 1974 through 1977, the Commissioner asserted deficiencies. Although other items initially were in dispute, the parties were able to reach agreement on every issue except that of

---

[1] During the years 1974 through 1977, the total amount that escheated to the State was less than $9,325. Stipulation of Facts ¶ 25.

the proper treatment of customer deposits for the years 1975, 1976, and 1977. The Commissioner took the position that the deposits were advance payments for electricity and therefore were taxable to IPL in the year of receipt. He contended that the increase or decrease in customer deposits outstanding at the end of each year represented an increase or decrease in IPL's income for the year.[2] IPL disagreed and filed a petition in the United States Tax Court for re-determination of the asserted deficiencies.

In a reviewed decision, with one judge not participating, a unanimous Tax Court ruled in favor of IPL. 88 T. C. 964 (1987). The court followed the approach it had adopted in *City Gas Co. of Florida* v. *Commissioner*, 74 T. C. 386 (1980), rev'd, 689 F. 2d 943 (CA11 1982). It found it nec-essary to "continue to examine all of the facts and circum-stances," 88 T. C., at 976, and relied on several factors in concluding that the deposits in question were properly ex-cluded from gross income. It noted, among other things, that only 5% of IPL's customers were required to make de-posits; that the customer rather than the utility controlled the ultimate disposition of a deposit; and that IPL con-sistently treated the deposits as belonging to the customers, both by listing them as current liabilities for accounting pur-poses and by paying interest. *Id.*, at 976–978.

The United States Court of Appeals for the Seventh Cir-cuit affirmed the Tax Court's decision. 857 F. 2d 1162 (1988). The court stated that "the proper approach to deter-mining the appropriate tax treatment of a customer deposit is to look at the primary purpose of the deposit based on all the

[2] The parties' stipulation sets forth the balance in IPL's customer-deposit account on December 31 of each of the years 1954, 1974, 1975, 1976, and 1977. In his notice of deficiency, the Commissioner concluded that IPL was required to include in income for 1975 the increase in the account between December 31, 1954, and December 31, 1975. For 1976 and 1977, IPL was allowed to reflect in income the respective decreases in the ac-count during those years.

facts and circumstances . . . ." *Id.*, at 1167. The court appeared to place primary reliance, however, on IPL's obligation to pay interest on the deposits. It asserted that "as the interest rate paid on a deposit to secure income begins to approximate the return that the recipient would be expected to make from 'the use' of the deposit amount, the deposit begins to serve purposes that comport more squarely with a security deposit." *Id.*, at 1169. Noting that IPL had paid interest on the customer deposits throughout the period in question, the court upheld, as not clearly erroneous, the Tax Court's determination that the principal purpose of these deposits was to serve as security rather than as prepayment of income. *Id.*, at 1170.

Because the Seventh Circuit was in specific disagreement with the Eleventh Circuit's ruling in *City Gas Co. of Florida, supra,* we granted certiorari to resolve the conflict. 490 U. S. 1033 (1989).

## II

We begin with the common ground. IPL acknowledges that these customer deposits are taxable as income upon receipt if they constitute *advance payments* for electricity to be supplied.[3] The Commissioner, on his part, concedes that customer deposits that secure the performance of non-income-producing covenants — such as a utility customer's obligation to ensure that meters will not be damaged — are not taxable income. And it is settled that receipt of a loan is not income to the borrower. See *Commissioner* v. *Tufts,* 461 U. S. 300, 307 (1983) ("Because of [the repayment] ob-

---

[3] This Court has held that an accrual-basis taxpayer is required to treat advance payments as income in the year of receipt. See *Schlude* v. *Commissioner,* 372 U. S. 128 (1963); *American Automobile Assn.* v. *United States,* 367 U. S. 687 (1961); *Automobile Club of Michigan* v. *Commissioner,* 353 U. S. 180 (1957). These cases concerned payments — nonrefundable fees for services — that indisputably constituted income; the issue was *when* that income was taxable. Here, in contrast, the issue is whether these deposits, as such, are income at all.

ligation, the loan proceeds do not qualify as income to the tax-payer"); *James* v. *United States*, 366 U. S. 213, 219 (1961) (accepted definition of gross income "excludes loans"); *Commissioner* v. *Wilcox*, 327 U. S. 404, 408 (1946).   IPL, stressing its obligation to refund the deposits with interest, asserts that the payments are similar to loans.   The Commissioner, however, contends that a deposit which serves to secure the payment of future income is properly analogized to an advance payment for goods or services.   See Rev. Rul. 72–519, 1972–2 Cum. Bull. 32, 33 ("[W]hen the purpose of the deposit is to guarantee the customer's payment of amounts owed to the creditor, such a deposit is treated as an advance payment, but when the purpose of the deposit is to secure a property interest of the taxpayer the deposit is regarded as a true security deposit").

In economic terms, to be sure, the distinction between a loan and an advance payment is one of degree rather than of kind.   A commercial loan, like an advance payment, confers an economic benefit on the recipient: a business presumably does not borrow money unless it believes that the income it can earn from its use of the borrowed funds will be greater than its interest obligation.   See *Illinois Power Co.* v. *Commissioner*, 792 F. 2d 683, 690 (CA7 1986).   Even though receipt of the money is subject to a duty to repay, the borrower must regard itself as better off after the loan than it was before.   The economic benefit of a loan, however, consists entirely of the opportunity to earn income on the use of the money prior to the time the loan must be repaid.   And in that context our system is content to tax these earnings as they are realized.   The recipient of an advance payment, in contrast, gains both immediate use of the money (with the chance to realize earnings thereon) *and* the opportunity to make a profit by providing goods or services at a cost lower than the amount of the payment.

The question, therefore, cannot be resolved simply by noting that respondent derives some economic benefit from re-

ceipt of these deposits.[4] Rather, the issue turns upon the nature of the rights and obligations that IPL assumed when the deposits were made. In determining what sort of economic benefits qualify as income, this Court has invoked various formulations. It has referred, for example, to "undeniable accessions to wealth, clearly realized, and over which the taxpayers have complete dominion." *Commissioner* v. *Glenshaw Glass Co.*, 348 U. S. 426, 431 (1955). It also has stated: "When a taxpayer acquires earnings, lawfully or unlawfully, without the consensual recognition, express or implied, of an obligation to repay and without restriction as to their disposition, 'he has received income . . . .'" *James* v. *United States*, 366 U. S., at 219, quoting *North American Oil Consolidated* v. *Burnet*, 286 U. S. 417, 424 (1932). IPL hardly enjoyed "complete dominion" over the customer deposits entrusted to it. Rather, these deposits were acquired subject to an express "obligation to repay," either at the time service was terminated or at the time a customer established good credit. So long as the customer fulfills his legal obligation to make timely payments, his deposit ultimately is to be refunded, and both the timing and method of that refund are largely within the control of the customer.

The Commissioner stresses the fact that these deposits were not placed in escrow or segregated from IPL's other funds, and that IPL therefore enjoyed unrestricted use of the money. That circumstance, however, cannot be dispositive. After all, the same might be said of a commercial loan; yet the Commissioner does not suggest that a loan is taxable upon receipt simply because the borrower is free to use the

---

[4] See *Illinois Power Co.* v. *Commissioner*, 792 F. 2d 683, 690 (CA7 1986). See also Burke & Friel, Recent Developments in the Income Taxation of Individuals, Tax-Free Security: Reflections on *Indianapolis Power & Light*, 12 Rev. of Taxation of Individuals 157, 174 (1988) (arguing that economic-benefit approach is superior in theory, but acknowledging that "an economic-benefit test has not been adopted, and it is unlikely that such an approach will be pursued by the Service or the courts").

funds in whatever fashion he chooses until the time of repayment. In determining whether a taxpayer enjoys "complete dominion" over a given sum, the crucial point is not whether his use of the funds is unconstrained during some interim period. The key is whether the taxpayer has some guarantee that he will be allowed to keep the money. IPL's receipt of these deposits was accompanied by no such guarantee.

Nor is it especially significant that these deposits could be expected to generate income greater than the modest interest IPL was required to pay. Again, the same could be said of a commercial loan, since, as has been noted, a business is unlikely to borrow unless it believes that it can realize benefits that exceed the cost of servicing the debt. A bank could hardly operate profitably if its earnings on deposits did not surpass its interest obligations; but the deposits themselves are not treated as income.[5] Any income that the utility may earn through use of the deposit money of course is taxable, but the prospect that income will be generated provides no ground for taxing the principal.

The Commissioner's advance-payment analogy seems to us to rest upon a misconception of the value of an advance payment to its recipient. An advance payment, like the deposits at issue here, concededly protects the seller against the risk that it would be unable to collect money owed it after it has furnished goods or services. But an advance payment does much more: it protects against the risk that the purchaser will back out of the deal before the seller performs. From the moment an advance payment is made, the seller is assured that, so long as it fulfills its contractual obligation, the money is its to keep. Here, in contrast, a customer submitting a deposit made no commitment to purchase a specified quantity of electricity, or indeed to purchase any elec-

---

[5] Cf. Rev. Rul. 71–189, 1971–1 Cum. Bull. 32 (inactive deposits are not income until bank asserts dominion over the accounts). See also *Fidelity-Philadelphia Trust Co.* v. *Commissioner*, 23 T. C. 527 (1954).

tricity at all.[6] IPL's right to keep the money depends upon the customer's purchase of electricity, and upon his later decision to have the deposit applied to future bills, not merely upon the utility's adherence to its contractual duties. Under these circumstances, IPL's dominion over the fund is far less complete than is ordinarily the case in an advance-payment situation.

The Commissioner emphasizes that these deposits frequently will be used to pay for electricity, either because the customer defaults on his obligation or because the customer, having established credit, chooses to apply the deposit to future bills rather than to accept a refund. When this occurs, the Commissioner argues, the transaction, from a cash-flow standpoint, is equivalent to an advance payment. In his view this economic equivalence mandates identical tax treatment.[7]

Whether these payments constitute income when received, however, depends upon the parties' rights and obligations *at the time the payments are made*. The problem with petitioner's argument perhaps can best be understood if we imagine a loan between parties involved in an ongoing commercial

---

[6] A customer, for example, might terminate service the day after making the deposit. Also, IPL's dominion over a deposit remains incomplete even after the customer begins buying electricity. As has been noted, the deposit typically is set at twice the customer's estimated monthly bill. So long as the customer pays his bills in a timely fashion, the money he owes the utility (for electricity used but not yet paid for) almost always will be less than the amount of the deposit. If this were not the case, the deposit would provide inadequate protection. Thus, throughout the period the deposit is held, at least a portion is likely to be money that IPL has no real assurance of ever retaining.

[7] The Commissioner is unwilling, however, to pursue this line of reasoning to the limit of its logic. He concedes that these deposits would not be taxable if they were placed in escrow, Tr. of Oral Arg. 4; but from a cash-flow standpoint it does not make much difference whether the money is placed in escrow or commingled with the utility's other funds. In either case, the utility receives the money and allocates it to subsequent purchases of electricity if the customer defaults or chooses to apply his refund to a future bill.

relationship. At the time the loan falls due, the lender may decide to apply the money owed him to the purchase of goods or services rather than to accept repayment in cash. But this decision does not mean that the loan, when made, was an advance payment after all. The lender in effect has taken repayment of his money (as was his contractual right) and has chosen to use the proceeds for the purchase of goods or services from the borrower. Although, for the sake of convenience, the parties may combine the two steps, that decision does not blind us to the fact that in substance two transactions are involved.[8] It is this element of choice that distinguishes an advance payment from a loan. Whether these customer deposits are the economic equivalents of advance payments, and therefore taxable upon receipt, must be determined by examining the relationship between the parties at the time of the deposit. The individual who makes an advance payment retains no right to insist upon the return of the funds; so long as the recipient fulfills the terms of the bargain, the money is its to keep. The customer who submits a deposit to the utility, like the lender in the previous hypothetical, retains the right to insist upon repayment in cash; he may *choose* to apply the money to the purchase of electricity, but he assumes no obligation to do so, and the utility therefore acquires no unfettered "dominion" over the money at the time of receipt.

When the Commissioner examines privately structured transactions, the true understanding of the parties, of course, may not be apparent. It may be that a transfer of funds, though nominally a loan, may conceal an unstated agreement that the money is to be applied to the purchase of goods or

---

[8] The Commissioner contends that a customer's decision to take his refund while making a separate payment for services, rather than applying the deposit to his bill, would amount to nothing more than an economically meaningless "exchange of checks." But in our view the "exchange of checks," while less convenient, more accurately reflects the economic substance of the transactions.

services.   We need not, and do not, attempt to devise a test for
addressing those situations where the nature of the parties'
bargain is legitimately in dispute.   This particular respond-
ent, however, conducts its business in a heavily regulated
environment; its rights and obligations vis-à-vis its customers
are largely determined by law and regulation rather than by
private negotiation.   That the utility's customers, when they
qualify for refunds of deposits, frequently choose to apply
those refunds to future bills rather than taking repayment in
cash does not mean that any customer has made an unspoken
commitment to do so.

Our decision is also consistent with the Tax Court's long-
standing treatment of lease deposits—perhaps the closest
analogy to the present situation.   The Tax Court tradition-
ally has distinguished between a sum designated as a pre-
payment of rent—which is taxable upon receipt—and a sum
deposited to secure the tenant's performance of a lease agree-
ment.   See, *e. g.*, *J. & E. Enterprises, Inc.* v. *Commis-
sioner*, 26 TCM 944 (1967).[9]   In fact, the customer deposits

---

[9] In *J. & E. Enterprises* the Tax Court stated: "If a sum is received by a
lessor at the beginning of a lease, is subject to his unfettered control, and is
to be applied as rent for a subsequent period during the term of the lease,
such sum is income in the year of receipt even though in certain circum-
stances a refund thereof may be required. . . . If, on the other hand, a sum
is deposited to secure the lessee's performance under a lease, and is to be
returned at the expiration thereof, it is not taxable income even though the
fund is deposited with the lessor instead of in escrow and the lessor has
temporary use of the money. . . . In this situation the acknowledged liabil-
ity of the lessor to account for the deposited sum on the lessee's perform-
ance of the lease covenants prevents the sum from being taxable in the
year of receipt."   26 TCM, at 945–946.

In Rev. Rul. 72–519, 1972–2 Cum. Bull. 32, the Commissioner relied in
part on *J. & E. Enterprises* as authority for the proposition that deposits
intended to secure income-producing covenants are advance payments tax-
able as income upon receipt, while deposits intended to secure nonincome-
producing covenants are not.   1972–2 Cum. Bull., at 33.   In our view, nei-
ther *J. & E. Enterprises* nor the other cases cited in the Revenue Ruling
support that distinction.   See *Hirsch Improvement Co.* v. *Commissioner*,

at issue here are less plausibly regarded as income than lease deposits would be. The typical lease deposit secures the tenant's fulfillment of a contractual obligation to pay a specified rent throughout the term of the lease. The utility customer, however, makes no commitment to purchase any services at all at the time he tenders the deposit.

We recognize that IPL derives an economic benefit from these deposits. But a taxpayer does not realize taxable income from every event that improves his economic condition. A customer who makes this deposit reflects no commitment to purchase services, and IPL's right to retain the money is contingent upon events outside its control. We hold that such dominion as IPL has over these customer deposits is insufficient for the deposits to qualify as taxable income at the time they are made.

The judgment of the Court of Appeals is affirmed.

*It is so ordered.*

---

143 F. 2d 912 (CA2), cert. denied, 323 U. S. 750 (1944); *Mantell* v. *Commissioner,* 17 T. C. 1143 (1952); *Gilken Corp.* v. *Commissioner,* 10 T. C. 445 (1948), aff'd, 176 F. 2d 141 (CA6 1949). These cases all distinguish between advance payments and security deposits, not between deposits that do and do not secure income-producing covenants.