WALTER J. LEVY AND AMNERIS LEVY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Levy v. Commissioner
Docket No. 29170-89
United States Tax Court
T.C. Memo 1991-391; 1991 Tax Ct. Memo LEXIS 456; 62 T.C.M. (CCH) 462; T.C.M. (RIA) 91391; August 12, 1991, Filed *456 Decision will be entered for the petitioners. Patricia Tucker, for the petitioners. Sandra Hayes, for the respondent. DAWSON, Judge. DAWSON
MEMORANDUM OPINION Respondent determined the following deficiencies in petitioners' Federal income taxes: Year
Deficiency
1979
$ 23,829.00
1980
10,793.00
1981
25,900.89
We must decide whether petitioners have met the requirements of section 46(e)(3)(B), [1] thus entitling them to an investment tax credit claimed in 1982 with respect to an airplane acquired in that year and thereafter held for lease. More specifically, the narrow question is whether the deductions allowable to petitioners as noncorporate lessors solely by reason of section 162 exceeded 15 percent of the rental income produced by leasing the airplane. The investment tax credit claimed by petitioners for 1982 was carried back to the years in issue and resulted in refunds for those years. *457 All of the facts have been stipulated. The stipulation of facts and attached exhibits are incorporated herein by this reference. The pertinent facts are summarized below. Facts
Petitioners resided in Santa Fe, New Mexico, when they filed their petition in this case. In October and November 1982, petitioners made payments totaling $ 725,000 on the purchase of an airplane -- a Riley Turbine Eagle 421, Serial Number 421C0011 -- from Riley Aircraft Manufacturing, Inc. (Riley). On October 28, 1982, Walter J. Levy (petitioner) executed a document entitled "Aircraft Management Agreement" (hereinafter referred to as the Agreement or the Riley lease) with Riley, which was later modified by an addendum dated November 18, 1982. The Agreement was for a term of 5 years beginning on the date possession of the airplane was transferred to Riley for management. Riley agreed to organize, promote, and provide full-time charter service on behalf of petitioner. Riley was to use its best efforts to arrange for leasing and chartering the airplane to third parties on long or short-term leases or charters or on such other terms and conditions as might be necessary for the successful operation *458 of the charter business. Pursuant to the terms of the Agreement, Riley was required to remit to petitioner all of the gross income, without deductions or offsets, derived from Riley's use or management of the airplane up to a minimum amount of $ 10,000 per month and guaranteed minimum payments of $ 10,000 per month. From gross income in excess of $ 10,000 per month, Riley was entitled to deduct and retain an amount equal to monthly "direct costs" of operating the airplane for charter. Any revenues in excess of the amounts needed for the monthly minimum and the direct costs were to be divided equally between Riley and petitioner. Under the terms of the Agreement, Riley was to pay petitioner $ 20,000, representing the rent for the first two months of the lease. Subsequent rents were due monthly beginning February 1, 1983. An additional $ 20,000, which was to be held as security, was to be paid at the commencement of the lease. The Agreement also contained a provision pertaining to the sublease of the airplane by Riley to third parties at specified rates. Pursuant to the Agreement, petitioner agreed to pay Riley a monthly management fee of $ 2,000 during the first year. In December *459 1982, he paid the $ 2,000 management fee to Riley. Although Riley had possession of the airplane as of December 1, 1982, it made none of the payments required by the Agreement. Riley did not make the $ 20,000 advance rental payment covering the first two months of the lease. It did not make the $ 20,000 security payment due at the commencement of the lease. It did not make subsequent payments of $ 10,000 per month. On December 29, 1982, Riley filed a petition for reorganization under Chapter 11 of the Bankruptcy Act. After petitioner was informed about the bankruptcy proceeding, he had his attorney notify Riley in January that it was in default and that the Agreement would be terminated. On January 26, 1983, the airplane was reacquired by petitioner, and, on the same date, he transferred its ownership to Turbine Eagle Charters, Inc. (Turbine), which is petitioners' wholly-owned S corporation. For the remainder of 1983 the airplane was leased to various lessees by Turbine, and all expenses of operating the airplane were paid by Turbine. For the period beginning January 26, 1983, and ending November 30, 1983, Turbine's income from the airplane leasing operations was $ 189,231.45, *460 and its total expenses were $ 321,065.08. The expenses allowable solely by reason of section 162 for the same period were $ 179,255.39. On May 6, 1983, petitioners filed a claim for $ 65,029.45 in the Riley bankruptcy proceeding, asserting that $ 50,000 represented rentals and $ 15,029.45 represented reimbursable expenses. After Riley's Chapter 11 proceeding was converted to a Chapter 7 proceeding on December 9, 1988, petitioners filed an amended claim on May 5, 1989, for $ 84,467.32. Petitioners have received no funds from the bankruptcy proceeding which is still pending. On April 15, 1983, petitioners timely filed their joint Federal income tax return for 1982 and paid the tax shown to be due thereon. On the return petitioners claimed $ 72,500 in investment tax credit related to the purchase of the airplane. A small portion of the $ 72,500 was applied as a credit in the taxable year 1982. The remainder was carried back to the taxable years 1979, 1980, and 1981, and in the amounts of $ 23,829, $ 10,793, and $ 25,900.89, respectively, leaving a further carryover to the taxable year 1983. In his notice of deficiency dated September 12, 1989, respondent disallowed the investment *461 tax credit claimed for 1982 and, consequently, disallowed the carrybacks of the claimed credit on petitioners' Federal income tax returns for 1979, 1980, and 1981 on the ground that the 15-percent test required by section 46(e)(3)(B) had not been met. Discussion
Section 38 allows an income tax credit for investment in certain depreciable property. However, the allowance of the credit to noncorporate lessors, such as petitioners, is limited by section 46(e)(3)(B), which provides as follows: SEC. 46. AMOUNT OF CREDIT. (e) LIMITATIONS WITH RESPECT TO CERTAIN PERSONS. - * * * (3) Noncorporate lessors. - A credit shall be allowed by section 38 to a person which is not a corporation with respect to property of which such person is the lessor only if - * * * (B) the term of the lease (taking into account options to renew) is less than 50 percent of the useful life of the property, and for the period consisting of the first 12 months after the date on which the property is transferred to the lessee the sum of the deductions with respect to such property which are allowable to the lessor solely by reason of section 162 (other than rents and reimbursed amounts with respect *462 to such property) exceeds 15 percent of the rental income produced by such property. [Emphasis added]
Section 1.46-4(d), Income Tax Regs., similarly provides in pertinent part: (d) Noncorporate lessors. (1) In the case of a lease entered into after September 22, 1971, a credit is allowed under section 38 to a noncorporate lessor of property with respect to the leased property only if - * * * (ii) The term of the lease (taking into account any options to renew) is less than 50 percent of the estimated useful life of the property (determined under § 1.46-3(e)), and for the period consisting of the first 12 months after the date on which the property is transferred to the lessee the sum of the deductions with respect to such property which are allowable to the lessor solely by reason of section 162 (other than rents and reimbursed amounts with respect to such property) exceeds 15 percent of the rental income produced by such property. [Emphasis added] * * * (3)(i) The more-than-15-percent test described in subparagraph (1)(ii) of this paragraph is based on the relationship of the expenses of the lessor relating to or attributable to the property to the *463 gross income from rents of the taxpayer produced by the property. The test is applied with respect to such expenses and gross income as are properly attributable to the period consisting of the first 12 months after the date on which the property is transferred to the lessee * * * [Emphasis added]. (ii) Only those deductions allowable solely by reason of section 162 are taken into account in applying the more-than-15-percent test. Hence, depreciation allowable by reason of section 167 (including amortization allowable in lieu of depreciation); interest allowable by reason of section 163; taxes allowable by reason of section 164; and depletion allowable by reason of section 611 are examples of deductions which are not taken into account in applying the test. * * * (iii) For purposes of the more-than-15-percent test, the gross income from rents of the lessor produced by the property is the total amount which is payable to the lessor by reason of the lease agreement other than reimbursements of section 162 expenses and charges for services which are separately stated or determinable. The fact that such amount depends, in whole or in part, on the sales or profits of the *464 lessee or the performance of significant services by the lessor shall not affect the characterization of such amounts as gross income from rents for purposes of this paragraph * * * [Emphasis added].
It is petitioners' position that they have met the 15-percent test of section 46(e)(3)(B), based on several alternative contentions. First, they contend that the relevant period for making the computation under the statutory provision is from December 1, 1982, to November 30, 1983, during which time the airplane was held for lease by petitioner through his agreement with Riley and then by Turbine, their S corporation. This contention is based on the premise that the allowable deductions ($ 181,255.39) under section 162 were 96 percent of the rental income ($ 189,231.45) produced by the two separate but consecutive leases combined for the 12-month period that ended on November 30, 1983. Second, they contend that, if each lease is considered independent of the other and only the Riley lease is relevant to the proper resolution of the issue, they have satisfied the 15-percent test because no rental income was "produced" (i.e., received) by the Riley lease, and the management fee *465 expense ($ 2,000) paid by petitioner in December of 1982 was more than 15 percent of the rental income. Third, they contend that section 1.46-4(d)(3)(iii), Income Tax Regs., which refers to rental income "payable," but not paid, should not be interpreted as controlling in this case. Fourth, they contend that, if section 1.46-4(d)(3)(iii), Income Tax Regs., is interpreted to include all rental income "payable," but not paid, under the provisions of the lease, the regulation is invalid as being out of harmony with the statutory language and unreasonable. Finally, petitioners suggest that both the rental income and allowable deductions should be accrued for purposes of the 15-percent test. Respondent counters petitioners' contentions by arguing that the relevant period for determining whether the 15-percent test has been met here consists solely of the term of the Riley lease, and by applying section 1.46-4(d)(3)(iii), Income Tax Regs., the rental income "produced" by the Riley lease should be interpreted to include all income "payable," but not paid, under its provisions. Under his theory respondent asserts that the rentals include $ 20,000 for the first two months after the airplane *466 was placed in service on December 1, 1982, and the $ 20,000 security deposit due at the beginning of the lease, or a total of $ 40,000. He then compares the management fee payment of $ 2,000 with the rental income "payable" of $ 40,000, and concludes that the allowable deductions were only 5 percent of the rental income. For the reasons hereafter stated, we hold that petitioners have met the 15-percent test of section 46(e)(3)(B). Accordingly, they are entitled to the claimed investment tax credit for 1982, resulting in no deficiencies for 1979, 1980, and 1981. In our judgment the resolution of the issue raised in this case calls for a simple, straightforward, and practical analysis. At the outset we think it is important to emphasize that the Riley lease was carefully structured so that petitioners could benefit by claiming the investment tax credit. It provided for a fixed ratio between the rental income ($ 10,000) petitioner would receive each month and the management fee expense ($ 2,000) he would pay Riley each month. The expense was 20 percent of the rental income. The term of the Riley lease, not subsequent events, determines the lessor's entitlement to the investment *467 tax credit. Bloomberg v. Commissioner, 74 T.C. 1368, 1372 (1980). We look only at the term of the Riley lease and the conditions that existed in 1982, the year the airplane was first placed in service. Petitioners did not know at the end of 1982 that Riley had defaulted under the Agreement. Nor has respondent argued that there was a default as a result of the Chapter 11 bankruptcy proceeding filed by Riley on December 29, 1982. If there had been no intervention of the Riley bankruptcy proceeding, the total rental income "payable" for the first 12 months after December 1, 1982, when the airplane was transferred to Riley, was $ 120,000. [2] The deductions allowable solely by reason of section 162 for the 12-month period were $ 24,000. Thus, the allowable deductions were 20 percent of the rental income "payable" to the lessor. To be entitled to the claimed investment tax credit, petitioners had to project at the end of 1982 the rental income "payable" under the provisions of the Riley lease and correspondingly the allowable deductions under section 162. In other words, if the rental income is accrued for computational purposes over the 12-month period, so must *468 the allowable deductions be accrued. Even if we were to treat the relevant period for computational purposes under section 46(e)(3)(B) as beginning on December 1, 1982, and ending on January 26, 1983, when petitioner terminated his agreement with Riley, reacquired the airplane, and transferred its ownership to Turbine, the rental income "payable" would have been $ 20,000 and the allowable deductions $ 4,000, thus meeting the 15-percent test. It is significant to point out that we have not included the $ 20,000 security deposit in these computations. The reason for this is that the Riley lease provided that the advance was intended as a deposit to be "held as security for Riley's performance." Hence, it did *469 not constitute rental income produced by the lease. This Court has traditionally distinguished between an amount designated as prepayment of rent which is taxable upon receipt and an amount deposited to secure the lessee's performance of a lease agreement. See, e.g., Commissioner v. Indianapolis Power & Light Co., 493 U.S. 203, 110 S. Ct. 589, 595, 107 L. Ed. 2d 591 (1990); Clinton Hotel Realty Corp. v. Commissioner, 128 F.2d 968, 969 (5th Cir. 1942); Mantell v. Commissioner, 17 T.C. 1143, 1148-1149 (1952). Almost as an afterthought, respondent asserts that the management fees are a capital expenditure and not deductions allowable under section 162, citing Seligman v. Commissioner, 796 F.2d 116 (5th Cir. 1986), affg. 84 T.C. 191 (1985). The Seligman case does not stand for the general proposition that management fees are never deductible expenses under section 162. Seligman involved a lease providing for payment of $ 225 per month for the first 12 months of a 41-month lease for administrative services that would be performed over the entire lease term. The Court of Appeals and this *470 Court emphasized that the fees created a capital asset (i.e., services for the 41-month period), and thus were allocable to, and had to be capitalized over, the 41-month period. The Seligman case is inapposite to this case. The fees in Seligman were prepaid in 12 months for a 41-month asset, whereas the $ 2,000 management fee for Riley was payable each month for the entire 5-year period of the Agreement over which the management services were to be performed. Having concluded that petitioners prevail on the key issue, we need not discuss or resolve any of the other contentions raised by the parties. Accordingly, Decision will be entered for the petitioners. Footnotes
1. All section references are to the Internal Revenue Code as amended and in effect for the years in issue.↩
2. We have not included in this amount the security deposit of $ 20,000 for the reasons explained later in this opinion. But, in any event, the inclusion of the security deposit over the 12-month period would result in the allowable deductions being 17 percent of the rental income "payable" to the lessor.↩