

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-8-2003

# Inductotherm Ind Inc v. USA

Precedential or Non-Precedential: Precedential

Docket No. 02-4292

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"Inductotherm Ind Inc v. USA" (2003). *2003 Decisions.* Paper 16.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/16

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed December 8, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 02-4292

INDUCTOTHERM INDUSTRIES, INC.

Appellant

v.

UNITED STATES OF AMERICA

Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil Action No. 99-cv-02451)
District Judge: Honorable Joseph H. Rodriguez

Argued July 31, 2003

Before: SCIRICA, *Chief Judge*, RENDELL
and AMBRO, *Circuit Judges*

(Opinion filed: December 8, 2003)

Ronald L. Glick, Esquire (Argued)
Stevens & Lee
1415 Route 70 East
Suite 506
Cherry Hill, NJ 08034

*Attorney for Appellant*

Eileen J. O'Connor
 Assistant Attorney General
Gilbert S. Rothenberg, Esquire
Francesca Ugolini, Esquire (Argued)
Department of Justice
Tax Division
Post Office Box 502
Washington, D.C. 20044

*Attorneys for Appellee*

---

## OPINION OF THE COURT

AMBRO, *Circuit Judge*:

This appeal involves a dispute between a taxpayer and the Internal Revenue Service about the proper time to recognize income and losses. The taxpayer maintains that it was not required to recognize the proceeds from the sale of goods as income in the year it received those proceeds because the funds were subject to a governmental blocking order and, under the Claim of Right Doctrine, it did not have unfettered discretion as to the funds. It also seeks to deduct the manufacturing costs of other goods in a year prior to that in which it sold those goods, reasoning that the Iraqi Sanctions Regulation then in place — which prohibited the taxpayer from selling those goods — either was in effect a confiscation or deprived the goods of any market value. The District Court held in favor of the Government as to both claims. We affirm.

## I.  Background

In 1989, taxpayer Inductotherm Industries, Inc. ("Inductotherm"), through its subsidiary Consarc,[1] contracted with Iraq to manufacture three vacuum furnaces. One furnace ("Furnace A") is an Induction Skull Melting Furnace. The other two ("Furnaces B and C") are Electron Beam Furnaces — a technology that later became

---

1. For convenience, we refer to Inductotherm and Consarc throughout this opinion simply as Inductotherm.

disfavored and apparently is no longer in widespread use today. Iraq represented that the furnaces would be used to manufacture prosthetics for veterans of the Iran-Iraq war. It later came to light that Iraq instead intended to use the furnaces in its nuclear weapons program. Inductotherm was unaware of Iraq's true intentions.

As the three furnaces were about to be exported to Iraq, it invaded Kuwait. In response, on August 2, 1990, President George H.W. Bush entered an Executive Order — the Iraqi Sanctions Regulation — blocking all property in which Iraq had an interest. As applied to Inductotherm, the Executive Order precluded the sale or transfer of the three furnaces without the permission of the Office of Foreign Assets Control ("OFAC"). Moreover, all funds in which Inductotherm had an interest due to the Iraqi contract were blocked pursuant to the Executive Order unless OFAC issued a license unblocking them. *See* 31 C.F.R. § 575.201, *et seq.* At the time, those funds in which Iraq potentially had an interest included a $6.4 million letter of credit ("LC") and Iraq's $1.1 million deposit for the three furnaces. Moreover, because Inductotherm had received this $1.1 million deposit, OFAC took the position that Iraq had a property interest in all three furnaces and thus they were blocked property.

To mitigate its losses, Inductotherm attempted to find new buyers for the furnaces. It sold Furnace A to Mitsubishi in its 1991 tax year for approximately $1.8 million.[2] Rather than place the sale proceeds in a blocked account, Inductotherm commingled them with other corporate funds. It was unable to sell Furnaces B and C in that year. Eventually, however, Inductotherm sold the furnaces in 1997 to Reading Alloys for what Inductotherm alleges was less than its production and carrying costs.

When the Government learned of the Mitsubishi sale, it directed Inductotherm to block the sale proceeds. On June 17, 1991, during Inductotherm's 1992 tax year, the Government confirmed those instructions by issuing a "Directive License," which specifically applied the Executive Order to Inductotherm. Inductotherm disputed, *inter alia*,

---

2. Inductotherm's tax year ends on April 30.

the applicability of the Executive Order to the sale proceeds, and protracted litigation ensued in the United States District Court for the District of Columbia and then in the United States Court of Appeals for the District of Columbia Circuit. Ultimately, the D.C. Circuit held that the furnaces, and the proceeds therefrom, were blocked property but could be released if Inductotherm placed the $1.1 million deposit in a blocked account — a procedure clearly contemplated in the Executive Order. *Consarc Corp. v. United States Treasury Dep't Office of Foreign Assets Control*, 71 F.3d 909 (D.C. Cir. 1995).

Meanwhile, when filing its tax returns, Inductotherm did not record the 1991 Furnace A sale proceeds as taxable income in 1991, reasoning that, as a result of the Executive Order and the Directive License, it did not have unfettered discretion to dispose of the proceeds. It urges that, under the Claim of Right Doctrine (discussed in Section II below), if a taxpayer does not have unfettered discretion with respect to funds, those funds need not be recognized as income. The IRS disputed Inductotherm's reasoning and assessed a tax deficiency. Inductotherm paid the back taxes on Furnace A as the IRS required and filed suit in the United States District Court for the District of New Jersey to recover the alleged overpayment. The Court held against Inductotherm on this issue, granting summary judgment in favor of the Government.

In its 1991 and 1992 tax years, Inductotherm took deductions on account of the production costs of Furnaces B and C, despite the fact that it did not sell them until 1997. Inductotherm argued that, while normally costs may be deducted only in the year that an item is sold, *see United States v. Catto*, 384 U.S. 102, 109 (1966), in its case an exception should apply: as a result of the Executive Order, the furnaces, in effect, were no longer Inductotherm's property and indeed were confiscated from it. The IRS disallowed this deduction. Again, Inductotherm paid the required tax deficiency and filed suit to recover. The District Court granted summary judgment in favor of the IRS on this claim as well.

Inductotherm appeals both rulings.[3]

## II. Discussion

### A. Furnace A

Inductotherm argues that it was not required to treat the sale proceeds for Furnace A as income in 1991 under the Claim of Right Doctrine. That Doctrine, set out in *North American Oil Consolidated v. Burnet*, 286 U.S. 417 (1932), holds that funds received by a taxpayer will be considered income if (1) "a taxpayer receives earnings under a claim of right" and (2) "without restriction as to its disposition," "even though it may still be claimed that [the taxpayer] is not entitled to retain the money, and even though [the taxpayer] may still be adjudged liable to restore its equivalent." *Id.* at 424.

Here, Inductotherm has conceded that it received the Furnace A proceeds under a "claim of right," *i.e.*, it acknowledged its entitlement to the proceeds. However, it disputes that it held the Furnace A proceeds without restriction as to disposition in 1991. Inductotherm reasons that the Executive Order, issued during its 1991 tax year, required it to place the funds in a blocked account (which, however, it did *not* do) and thus restricted its discretion as to those funds in 1991. Inductotherm relies principally on a line of cases holding that public utilities were not required to recognize as income customers' deposits, prepayments, or "overrecoveries," which those utilities clearly were obligated to return, despite the fact that the utilities commingled the funds (as Inductotherm did). *See, e.g., Commissioner v. Indianapolis Power & Light Co.*, 493 U.S. 203 (1990) (customer deposits made to assure prompt payment of future bills not income; even though funds commingled with general funds, deposits represent merely loans because customers are entitled to demand return of funds under specified circumstances); *Mutual Tel. Co. v.*

---

3. The District Court had jurisdiction under 28 U.S.C. § 1331. We exercise jurisdiction pursuant to 28 U.S.C. § 1291. Because the issues in this appeal are questions of law, our review is plenary. *Epstein Family P'ship v. Kmart Corp.*, 13 F.3d 762, 765-66 (3d Cir. 1994).

*United States*, 204 F.2d 160, 161 (9th Cir. 1953) (monies utility held in reserve at the direction of the Public Utilities Commission were not income because "it cannot be said that the receipts came into the possession of [the utility] subject to its 'unfettered command' and that it was free to enjoy the receipts at its option"); *Florida Progress Corp. v. Commissioner*, 114 T.C. 587, 599 (T.C. 2000) ("Because the time and method of refunding overrecoveries is controlled by [agencies] rather than by Florida Power, [it] does not have complete dominion over the overrecoveries and is not required to recognize them as income when received."); *Houston Indus. Inc. & Subs. v. United States*, 32 Fed. Cl. 202, 210 (Fed. Cl. 1994) ("overrecoveries" for fuel costs are not income because "[e]very dollar of overrecovery must eventually be repaid.").

The Government argues that these utility cases are not analogous because the first prong of the Claim of Right Doctrine was not satisfied: the utilities did not claim that they were entitled to the funds for their own benefit. Rather, they conceded at all times that they held the funds in a fiduciary capacity or, at least, with a clear obligation to return the funds. Moreover, as to the second prong, the utilities' discretion with respect to the funds was at all times limited by extensive regulatory oversight by state administrative agencies. The Government directs our attention instead to *James v. United States*, 366 U.S. 213 (1961), which held that money embezzled must be included in income, even though it likely would have to be disgorged in the future. Just as Inductotherm argues that its commingling of the Furnace A proceeds is not dispositive under the utility cases, the Government cites *James* for the proposition that Inducotherm's legal duty to block the proceeds under the Executive Order is likewise not dispositive. In *James*, it was clear that the embezzler had no right to the funds at issue. Nonetheless, because the embezzler treated the funds as his own during the relevant tax year, he was required to recognize those funds as income.

We agree with the Government. As already noted, Inductotherm's concession (no doubt correct) that it asserted title to the proceeds of Furnace A's sale in 1991 answers the first prong of the Claim of Right Doctrine.

As to the Doctrine's second prong (no disposition restriction on the sale proceeds), Inductotherm, having commingled the funds instead of blocking them, placed itself in a position of complete dominion over those funds (at least during the 1991 tax year). In this context, the Executive Order was "a potential or dormant restriction . . . which depends on the future application of rules of law to present facts [and therefore was] not a 'restriction on use' within the meaning of *North American Oil v. Burnet*." *Healy v. Commissioner*, 345 U.S. 278, 284 (1953). The Government was entitled to prosecute Inductotherm for failure to comply with the Executive Order. However, as with any regulation or criminal law, the Government had the discretion not to pursue Inductotherm's Executive Order violation. Thus, Inductotherm's control over the Furnace A proceeds was analogous to that of the embezzler in *James*.[4] *See also Continental Illinois Corp. v. Commissioner*, 998 F.2d 513 (7th Cir. 1993) (because bank's obligation to refund interest paid over a known percentage is contingent on the fulfillment of conditions by the debtor, and thus the obligation is uncertain, bank must treat interest as income in year received).

That Inductotherm was required *after* the conclusion of the 1991 tax year to block the Furnace A proceeds is in no way relevant to the analysis. There are numerous cases in which a taxpayer treated funds as its own in one year, only to find that it was required to disgorge them in a later year. In all these cases, courts required the taxpayer to recognize the funds as income in the year received, notwithstanding the later disgorgement. *See, e.g.*, *Healy*, 345 U.S. 278 (salary a taxpayer earned in one year from a closed corporation in which he was an officer and stockholder, which had to be returned to the company in a subsequent year because it was excessive compensation, was income in the year the salary was earned); *Wentworth v. Commissioner*, 510 F.2d 883 (6th Cir. 1975) (taxpayer whose stock was illegally redeemed was required to recognize proceeds from redemption in year he received

---

4. While we do not suggest that Inductotherm's behavior was criminally culpable (as was that of the taxpayer in *James)*, its position for tax purposes is legally indistinguishable.

them, despite later duty to return proceeds); *United States v. Lesoine*, 203 F.2d 123 (9th Cir. 1953) (taxpayer properly included dividend as income in the year it was received, even though it was later determined that dividend had to be repaid to corporation because there was insufficient surplus for payment); *Saunders v. Commissioner*, 101 F.2d 407 (10th Cir. 1939) (sums taxpayers received from the sale of corporation's capital stock were income, although taxpayers returned money to corporation on advice of counsel, who said that taxpayers were not entitled to receive funds).

In this context, the Claim of Right Doctrine does not shield the Furnace A proceeds from being income in 1991.

**B. Furnaces B and C**

Inductotherm sold Furnaces B and C in 1997. However, it sought to deduct production costs of those furnaces in its 1991 and 1992 tax years. In the District Court, Inductotherm claimed that the Executive Order was in effect a confiscation that deprived it of its property rights in those two furnaces and thus, under § 165(a) of the Internal Revenue Code,[5] it was entitled to deduct the costs of the furnaces when the Executive Order went into effect.

26 C.F.R. § 1.165-1 sets out a two-prong test for determining whether a taxpayer may recognize a loss under § 165(a) in a given year. There must be: (1) a closed and completed transaction fixed by identifiable events and (2) no reasonable prospect of recovery. Inductotherm contends that the promulgation of the Executive Order was a closed and completed transaction with respect to Furnaces B and C, and in 1991 and 1992 there was no reasonable prospect that it would recover the furnaces.

This argument fails. First, other courts have held, as a matter of law, that a blocking order is not a closed and completed transaction because it is merely a temporary restriction on the use of property. *See, e.g., Tran qui Than v. Regan*, 658 F.2d 1296, 1301 (9th Cir. 1981) ("The

---

5. 26 U.S.C. § 165(a) provides that "[t]here shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise."

blocking of the assets . . . does not affect the interest, right or title to them which [the taxpayer] may possess. The blocking action merely suspends indefinitely the right to transfer those funds.") (internal citation omitted); *Nielsen v. Sec'y of the Treas.*, 424 F.2d 833, 843-44 (D.C. Cir. 1970) ("The blocking of accounts is generally recognized as different from taking, though raising a problem of taking 'if continued indefinitely.' "). Moreover, we note that a taxpayer may not recognize a loss unless it has exhausted its remedies to reduce its loss. *Investors Diversified Servs., Inc. v. Commissioner*, 325 F.2d 341, 350 (8th Cir. 1963). In this case, Inductotherm could have sought a license from OFAC to unblock Furnaces B and C. *See* 31 C.F.R. §§ 575.202(c), 575.203(c). Yet it did not do so.

On appeal, Inductotherm sets out what it acknowledges is a new theory for deducting the costs of Furnaces B and C in 1991 and 1992. It argues that, because electron-beam furnaces such as Furnaces B and C used a disfavored technology, the Executive Order's promulgation deprived it of the only available market for the furnaces — Iraq, leaving the furnaces with little or no resale value. In this context, Inductotherm contends that it was entitled to recognize a loss under 26 C.F.R. § 1.471-2, which directs companies to value their inventory at the lower of cost or market value and allows write-downs based on declines in inventory value (*e.g.*, for obsolescence).[6]

Ironically, Inductotherm expressly disclaimed reliance on this theory before the District Court. In response to an interrogatory from the Government, Inductotherm stated, "Plaintiff claims the deductions taken in fiscal years 1991 and 1992 because of the lack of control over the assets as a result of the freeze on the assets as issued by President Bush, not because there was an actual loss of value to the actual assets." The response went on explicitly to state, "Plaintiffs do not assert that the deductions were taken pursuant to Section 471."

In light of Inductotherm's express disclaimer in the District Court, we decline to entertain this new argument

---

6. Regulation § 1.471-2 complements § 471 of the IRC, which sets out the general rule for valuing inventories.

on appeal.[7] Moreover, considering this argument would require calculating the decline in market values of Furnaces B and C that the Executive Order caused. Yet Inductotherm has failed to enter into the record any data that would enable us (or the District Court on remand) to perform this inquiry.[8] Having failed to meet its burden, we decline to give Inductotherm a second turn at bat.[9]

\* \* \* \* \* \* \* \* \* \* \*

Under the Claim of Right Doctrine, Inductotherm was required to recognize proceeds from the sale of Furnace A in the year it received those proceeds, 1991. Moreover, Inductotherm did not adequately prove its entitlement to deduct costs associated with Furnaces B and C in 1991 and 1992. We therefore affirm the District Court's grant of summary judgment in favor of the Government.

A True Copy:
     Teste:

*Clerk of the United States Court of Appeals
for the Third Circuit*

---

7. Inductotherm also makes essentially the same argument under IRC § 165, contending that because of the Executive Order Furnaces B and C were unsaleable on the open market and therefore it was permissible to recognize their decline in value in 1991 and 1992. Because Inductotherm's response to the Government's interrogatory stated that it did not claim "an actual loss of value to the actual assets," which is the factual underpinning of this new § 165 argument, we deem this argument waived on appeal as well.

8. Inductotherm argues that it provided this information in its position letter to the IRS, attached to the complaint. However, the position letter contains no "evidence" as such, but rather Inductotherm's arguments that the end-of-year value of Furnaces B and C was $0 because the Executive Order deprived them of any market value. These assertions, without more, do not provide a basis for a court to calculate Furnaces B and C's decline in value.

9. While we will consider arguments raised for the first time on appeal "where a gross miscarriage of justice would occur," *Kahn v. United States*, 753 F.2d 1208, 1222 n.8 (3d Cir. 1985), this is not such a case.