T.C. Memo. 2009-285

UNITED STATES TAX COURT

BILL S. MCGOWEN AND CAROLYN M. MCGOWEN, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 14116-07.                    Filed December 14, 2009.

<u>Harold A. Chamberlain</u>, for petitioners.

<u>Thomas Fenner</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

PARIS, <u>Judge</u>:  Respondent determined an income tax
deficiency of $171,631 for petitioners' 2004 tax year.
Respondent conceded the section 6662 penalty.  The two remaining
issues are:  (1) Whether petitioners' income as a result of the
termination of a variable life insurance policy should be

characterized as income from a life insurance contract pursuant to section 72(e) or income from the discharge of indebtedness; and (2) whether petitioners' income, if derived from the discharge of indebtedness, should be excluded from their gross income pursuant to section 108(g).

All section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

### FINDINGS OF FACT

Some of the facts were stipulated. The stipulation of facts, together with the exhibits attached thereto, is incorporated herein by this reference.

Bill S. McGowen (Mr. McGowen) and Carolyn M. McGowen (Mrs. McGowen) are husband and wife, and they filed a joint Federal income tax return for the year 2004. At the time the petition was filed, they resided in New Mexico.

On May 30, 1986, Mrs. McGowen purchased a single-premium variable life insurance policy (insurance policy) on her own life for $500,000. Upon her death, the insurance policy would have conferred on the beneficiary a benefit in excess of the policy debts she incurred. The death benefits consist of the return on the investments made by the insurer and the guaranteed amount. According to the insurance policy, the insurer invests in mutual

funds[1] exclusively. The insurer purchases, sells, and holds the shares of the mutual funds, but does not manage them. The insurer purchases shares in the mutual funds from separate investment advisers if that mutual fund satisfies the insurance policy's restrictions and objectives and sells them if the mutual fund ever fails to meet those standards. In contrast, the guaranteed amount is determined on the basis of the year the beneficiary receives the benefit. In the initial year, the beneficiary will receive solely the guaranteed amount. For all subsequent years the benefit will vary in accordance with the positive return of the investment in the mutual fund but will not be less than the guaranteed amount.

Mrs. McGowen had the right to cancel the insurance policy and receive its net cash value.[2] The insurance policy defines the net cash value as the cash value[3] minus any policy debt. The policy debt consists of the sum of all outstanding loans plus accrued interest. The insurance policy permits Mrs. McGowen to

---

[1]A mutual fund is an investment company that pools money from the sale of its corporate shares and invests the money in stock, short-term money market instruments, and other securities.

[2]The net cash value at the time of cancellation is also referred to as the net cash surrender value.

[3]The insurance policy defines cash value using a calculation where "the cash value on a date equals the tabular cash value on the date plus the net single premium on that date for the Variable Insurance amount." Tabular cash value refers to the value shown on the insurance policy's schedule B.

borrow money at a 5.25-percent annual interest rate. Any unpaid interest due at the end of the policy year will be added to the amount of the loan. The insurance policy further requires that the insurance policy itself serve as collateral and that the insurance policy terminate if the policy debt ever exceeds the cash value.

The insurance policy states that any amount borrowed by the insured would cause a withdrawal of that exact amount from the investment base and an allocation of that fund to a separate general account. Any fund directed to the separate general account would earn a 4.5-percent annual rate of return.

On May 31, 1989, Mrs. McGowen first exercised her right to borrow $25,000 from the insurance policy to pay her personal expenses. On the same day, she received a letter from the insurer indicating that her investment base, net cash surrender value, and death benefits would be decreased by $25,000. In a letter dated June 29, 1989, the insurer sent another monthly notice reporting Mrs. McGowen's total loan balance of $50,104.28 based upon an additional $25,000 borrowed by Mrs. McGowen and the accrued interest of $104.28. Mrs. McGowen would continue to receive these monthly notices throughout the life of the insurance policy. Over the next year, Mrs. McGowen borrowed monthly amounts ranging from $5,000 to $25,000, totaling $235,000 by April 1990. On June 1, 1990, Mrs. McGowen made a $7,444.22

payment, which was applied towards the interest accrued on the loans. From June 11, 1990, to April 8, 1991, Mrs. McGowen borrowed additional amounts totaling $216,000. In January 1992 she borrowed her last amount of $2,500. In addition, the insurer also sent yearly reports stating that the amounts Mrs. McGowen borrowed had accrued annual interest of $39,553.15 for the year 1998, $41,629.69 for the year 1999, $43,815.25 for the year 2000, $46,115.55 for the year 2001, $48,536.62 for the year 2002, and $51,084.79 for the year 2003. Those annual interest notices stated in bold that the interest due would be added to her outstanding loans if she did not make any payments. Last, Mrs. McGowen received letters each year stating that if she surrendered her insurance policy by a date certain she would incur a taxable gain. Those letters indicated that on May 28, 1999, May 30, 2000, May 29, 2001, May 28, 2002, and May 28, 2003, she would have incurred a taxable gain of $413,124.30, $456,684.62, $480,124.92, $506,400.60, and $536,831.59, respectively. Additionally, the record demonstrated that the insurer corresponded with Mr. McGowen, apprising him of the financial history of Mrs. McGowen's insurance policy.

By 1992 Mrs. McGowen had borrowed amounts totaling $536,500. Before the cancellation of the insurance policy, Mrs. McGowen had made only the one payment of $7,444.22 on June 1, 1990. In September 1993 Mrs. McGowen did make an inquiry regarding the

surrender of her policy but apparently chose not to act.  By 2000 the interest accrued on the policy debt had drastically exceeded the diminishing return rendered by both the investment base and the general account.  Consequently, the already reduced net cash surrender value of the insurance policy continued to shrink rapidly.  The insurance policy had net cash surrender values of $78,293.21 on May 28, 2000, $55,617.96 on May 28, 2001, $33,357.02 on May 28, 2002, and $12,703.22 on May 28, 2003.  By November 28, 2003, the monthly statement had indicated that the net cash surrender value had been diminished to $2,782.25.

On March 1, 2004, the insurer issued a notice warning Mrs. McGowen that her outstanding policy debt had exceeded the insurance policy's cash value as of February 28, 2004, and the termination of the insurance policy would occur within 31 days if she did not make a payment of $108,313.42.  That notice also stated that the cancellation of the insurance policy would be a taxable event, whereby she would have to recognize $562,746.04 as of February 28, 2004.  Interest would still accrue during the 31-day grace period.  Mrs. McGowen did not make the payment.  On March 30, 2004, the insurer sent a letter informing Mrs. McGowen of the cancellation of the insurance policy and the issuance of an Internal Revenue Service Form 1099-R, Distributions From Pensions, Annuities, Retirement or Profit-Sharing Plans, IRAs, Insurance, Contracts, etc., reporting a gain of $565,224.11.

OPINION

Burden of Proof

Respondent's determinations in the notice of deficiency are presumed correct, and petitioners bear the burden of disproving those determinations. See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

Issue 1. Gross Income

Gross income includes all income from whatever source derived. Sec. 61. Section 61 lists specifically some forms of gross income, including the income from a life insurance contract and the income from a discharge of indebtedness. See sec. 61(a)(10), (12). Neither party disputes that petitioners have received income as a result of the termination of their variable life insurance policy and that petitioners intended to report that income on their 2004 joint return. The parties' dispute concerns the kind of income petitioners received. A variable life insurance contract is a permanent form of insurance in which the cash value is based on the performance of an underlying pool of securities. See Much v. Pac. Mut. Life Ins. Co., 266 F.3d 637, 638 (7th Cir. 2001). The Court holds that petitioners received income attributable to the termination of their variable life insurance policy pursuant to section 72(e).

Petitioners argue that their income arose from the discharge of Mrs. McGowen's indebtedness of $1,065,224.11. The Court respectfully disagrees.

For Federal income tax purposes, petitioners' policy loans were true loans. See Atwood v. Commissioner, T.C. Memo. 1999-61. The parties have agreed to this fact, and the Court concurs. The insurance policy required by its terms the payment of a 5.25-percent interest rate on amounts borrowed against the policy, a requirement indicative of a bona fide debt. See Salley v. Commissioner, 55 T.C. 896, 903 (1971), affd. 464 F.2d 479 (5th Cir. 1972); Kay v. Commissioner, 44 T.C. 660, 670-672 (1965); Dean v. Commissioner, 35 T.C. 1083, 1085 (1961). Consequently, petitioners would not have had to recognize these loans as taxable income when they received them. See Commissioner v. Indianapolis Power & Light Co., 493 U.S. 203, 207-208 (1990); Commissioner v. Tufts, 461 U.S. 300, 307 (1983).

Petitioners did not receive income from discharge of indebtedness. A discharge of indebtedness occurs when "the debtor is no longer legally required to satisfy his debt either in part or in full." Caton v. Commissioner, T.C. Memo. 1995-80; see also United States v. Centennial Savings Bank FSB, 499 U.S. 573, 580-581 (1991). On the basis of facts presented, the Court cannot characterize the source of petitioners' income as income derived from the discharge of indebtedness. The record here

indicates that the loans to Mrs. McGowen were not discharged: they were extinguished after the insurer had applied the cash value of the insurance policy towards the debt owed by Mrs. McGowen. The insurance policy itself was the sole collateral for which the insurer can seek repayment of the amount Mrs. McGowen borrowed. Consequently, the insurance policy mandates the immediate surrender of the insurance policy once the amount borrowed against the policy exceeds the cash surrender value. Petitioners had been fairly warned by the numerous letters notifying them of the increasing possibility of the cancellation of Mrs. McGowen's insurance policy.

The present record instead supports the characterization of petitioners' income as income received from a life insurance contract. Any distribution from Mrs. McGowen's insurance policy would fall within the purview of section 72(e)(1). Section 72(e)(1) mandates that a taxpayer include in his gross income any amount that is received under an annuity, endowment, or life insurance contract and is not received as an annuity. Section 72(e)(5) limits this inclusion to the amount exceeding the investment in the contract. Investment in the contract as of any date will be the difference between the aggregate of premiums or other consideration paid for the contract before such date, and the aggregate amount received under the contract before such date to the extent that such amount was excluded from gross income.

Sec. 72(e)(6). The Court cannot conclude that Mrs. McGowen received any direct distributions from her life insurance policy. Nevertheless, for the following reasons, the Court holds that petitioners must recognize the indirect distribution of income Mrs. McGowen received from her insurance policy under section 72(e).

A taxpayer may be required to recognize an indirect distribution of an insurance policy's cash value as gross income under section 72. This Court reached that conclusion in Atwood v. Commissioner, supra, among other cases. Each of the married taxpayers in Atwood purchased an individual life insurance policy, paying a single premium. See id. Those taxpayers each borrowed the maximum amount permitted by their insurance policies yet did not make any loan payments, causing those policies to be terminated. Upon the termination of the husband's policy, the insurer issued to the husband a check in the amount by which the cash surrender value of his policy exceeded his loan. The wife did not receive a check upon termination of her policy because her loan had exceeded the cash surrender value of her policy. Both taxpayers received a Form 1099 reflecting gain from the surrender of their insurance policy. This Court held in Atwood that the taxpayers received gross income under section 72(e). This Court reasoned that the taxpayers had received a deemed

distribution to the extent of their satisfied loans and explained further:

> When petitioners' policies terminated, their policy loans, including capitalized interest, were charged against the available proceeds at that time. This satisfaction of the loans had the effect of a pro tanto payment of the policy proceeds to petitioners and constituted income to them at that time. * * *

Id. Any conclusion otherwise "would permit policy proceeds, including previously untaxed investment returns, to escape tax altogether and finds no basis in the law." Id.

Similar to the taxpayers in Atwood, petitioners must recognize the indirect distribution from Mrs. McGowen's insurance policy as gross income under section 72(e). The insurer applied the cash value of Mrs. McGowen's insurance policy to extinguish her loan. This would then have the same effect as the "pro tanto payment" described by this Court in Atwood. Furthermore, this Court maintains that the distributed policy proceeds attributed to the return on investments must be taxed since the accruals on the investments were not previously taxed. Untaxed accrual on an investment is often referred to as inside buildup.

Pursuant to section 72(e), petitioners must recognize $565,224.11 as gross income, based upon the difference between Mrs. McGowen's investment in the contract and the cash value of the policy on the date of cancellation. The cash value at the time of surrender was $1,065,224.11, which, by the contractual

terms, cannot be less than the aggregate of all the amounts borrowed by Mrs. McGowen and the accrued interest. Mrs. McGowen's investment in the contract was $500,000. Also, the excess of the insurance policy's cash surrender over the cost of the contract would be attributable to the previously untaxed inside buildup which Mrs. McGowen must now recognized as income of $565,224.11.

Issue 2. Exclusion From Gross Income

Petitioners have raised the issue of whether the income, if derived from the discharge of indebtedness, should be excluded from their gross income under section 108(g). This issue is moot because the Court has held that Mrs. McGowen's debts were not discharged and, thus, petitioners' income was not from discharge of indebtedness.

Decision will be entered

for respondent.