T.C. Memo. 2002-248

UNITED STATES TAX COURT

TAMPA BAY DEVIL RAYS, LTD., NAIMOLI BASEBALL
ENTERPRISES, INC., TAX MATTERS PARTNER, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 7452-00.                    Filed September 30, 2002.

<u>Denton N. Thomas</u> and <u>Susan V. Sample</u>, for petitioner.

<u>Robert W. Dillard</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

SWIFT, <u>Judge</u>:  Respondent determined adjustments to the
Federal partnership tax returns of the Tampa Bay Devil Rays, Ltd.
(the partnership) for 1995 and 1996 as follows:

| Year | Income Adjustments |
|------|--------------------|
| 1995 | $3,328,455 |
| 1996 | 3,689,182 |

Unless otherwise indicated all section references are to the Internal Revenue Code for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The primary issue for decision is whether deposits the partnership received in 1995 and 1996 on advance season tickets and on private suite reservations for major league baseball games expected to be played in 1998 are to be included in the income of the partnership when received in 1995 and 1996, or in 1998, the year to which the advance season tickets and the private suite reservations related and the first year in which the partnership's major league baseball team (the Devil Rays) played major league baseball.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

The partnership was formed as a limited partnership on August 10, 1994, under the laws of the State of Florida. At the time the petition was filed, the partnership's principal place of business was located in St. Petersburg, Florida.

The partnership was formed to acquire, own, manage, and operate a major league baseball team in St. Petersburg, Florida.

Petitioner, Naimoli Baseball Enterprises, Inc., is a Florida corporation and functions as the tax matters partner of the partnership.

On March 9, 1995, in return for commitments by the partnership to pay a $130 million franchise fee and to meet other specified conditions, members of the American and National Leagues of major league baseball (hereinafter generally referred to simply as major league baseball) adopted a resolution under which the partnership was conditionally awarded one of major league baseball's expansion franchises. The resolution established a procedure for the eventual approval of the partnership and the Devil Rays to participate in major league baseball.

On March 24, 1995, the partnership and major league baseball entered into an agreement under which the partnership would become a full, participating member of major league baseball upon the satisfaction, no later than November 30, 1997, of the conditions specified in the above resolution and agreement.

Under the resolution and agreement, the major requirements and conditions that the partnership had to satisfy prior to receiving final approval for participation in major league baseball are described below:

(1) Obtain the funding and lines of credit sufficient to pay the $130 million franchise fee and to provide the working capital funds necessary for operation of a major league baseball team;

(2) Make full payment of the $130 million franchise fee according to the following schedule:

|     Due Date     |     Amount     |
| --- | --- |
| July 1, 1995 | $32 million |
| July 1, 1996 | 25 million |
| July 1, 1997 | 40 million |
| Nov. 1, 1997 | 33 million |

(3) Obtain the funding for and complete renovation of the Thunderdome, the existing, domed stadium in St. Petersburg, Florida, obtain approval from the Commissioner of major league baseball of the completed renovations to the stadium, and obtain a use lease on the stadium effective January 1998;

(4) Obtain from the pre-existing minor league baseball teams located in the geographic region of St. Petersburg, Florida, the territorial or license rights to operate in the region a professional baseball team; and

(5) Establish a minor league baseball system.


As indicated, the resolution and agreement did not constitute either the partnership or the Devil Rays a final member of and participant in major league baseball. The partnership and the Devil Rays were not yet permitted to sign players to major league contracts, nor to field a major league baseball team. Rather, the resolution and agreement authorized the partnership to proceed to establish an expansion franchise that would, subject to the fulfillment of the various conditions

no later than November 30, 1997, be subject to final approval by the members of major league baseball. If approved, the partnership would then be permitted to sign major league baseball players and to field a major league baseball team for participation in major league baseball beginning with the 1998 major league baseball season.

On April 28, 1995,[1] the partnership executed with the city of St. Petersburg, Florida, an agreement for the renovation, management, operation, and use of the Thunderdome for major league baseball beginning with the 1998 season. Renovations to the stadium began in 1995.

From March 1995 through early November 1997, representatives of the partnership were entitled to attend the periodic meetings of the members of major league baseball. The partnership, however, had no vote at the member meetings, was not yet permitted to field a major league baseball team, and generally was not yet authorized to participate or share in major league baseball's central fund (i.e., the revenue and liabilities associated with the play each season of major league baseball).

Beginning in 1996, the partnership did receive limited funds from major league baseball in connection with third-party

[1] Dates for events reflected in our findings of fact conform to the dates reflected in the parties' stipulation of facts and other trial evidence. Some of those dates differ by a day or two from dates for the same events reflected in the mass media. See, e.g., http://www.tampabay.devilrays.mlb.com.

licenses of major league baseball names, logos, and emblems (apparently because the partnership in 1996 began selling merchandise reflecting the Devil Rays' logo).

From March 1995 until November 6, 1997, the partnership worked diligently to satisfy the above requirements and conditions, working with third parties whose cooperation and approval was necessary. The partnership obtained the financing, and on the scheduled installment dates the partnership paid major league baseball the $130 million franchise fee.

Beginning in 1995 and continuing through 1996, 1997, and 1998, through various affiliation agreements with, among others, Suncoast Baseball, Inc., Orlando Rays, Inc. (a subsidiary of petitioner), and The Durham Bulls Baseball Club, Inc., the partnership established minor league baseball teams based in Florida, North Carolina, and elsewhere.

By fall 1997, the partnership had satisfied all of the conditions of the March 1995 resolution and agreement with major league baseball. Accordingly, on November 6, 1997, final agreements were entered into between the partnership and major league baseball. Thereunder, a major league baseball membership certificate was transferred to the partnership entitling the partnership to field a major league baseball team and to play in the American League at the beginning of the 1998 season.

Also, on November 6, 1997, and with respect to the 1998 major league baseball season, the partnership and the Devil Rays for the first time received the right to participate in, and assumed the liabilities associated with, major league baseball's central fund. Further, beginning with the 1998 season, the partnership became subject to other agreements relating to its participation, and to the Devil Rays' play, in major league baseball. For example, beginning with the 1998 season the partnership and the Devil Rays became subject to:

(1) The major league baseball rules;

(2) The union agreement between major league baseball and the major league baseball Players Association;

(3) The agreements between major league baseball and network television and other media;

(4) The agreement between major league baseball and the major league baseball Umpires Association; and

(5) The major league baseball Players Benefit Plan.

On November 17, 1997, the partnership participated in an expansion draft of players already under contract with other major league baseball teams that was held for the benefit of the Devil Rays and the Arizona Diamondbacks, the other expansion team. In the expansion draft, the partnership drafted 35 major league baseball players for the Devil Rays. Approximately one half, or $74,725,000, of the $130 million franchise fee was allocated by the partnership to the contracts of the major league

baseball players that the partnership drafted and signed in late 1997 and early 1998 for the Devil Rays' 1998 major league baseball season.

During 1995 and 1996, the partnership received funds from customers as deposits on advance season tickets (representing 25 percent of the total stated season ticket price), as deposits on reservations for private suites, and one sponsor fee in anticipation of major league baseball games to be played by the Devil Rays in St. Petersburg, Florida, during the 1998 major league baseball season.

On the application form for the advance 1998 season tickets, it was indicated that the customers' deposits were "nonrefundable". However, in spite of the reference to nonrefundability on the application forms for advance season tickets, if the partnership did not fulfill the conditions specified in the March 1995 major league baseball resolution and agreement, if the partnership and the Devil Rays were not eventually and finally approved to participate in major league baseball, and if the Devil Rays failed to play major league baseball games in 1998, the partnership would have been required to refund the deposits received from customers in 1995 and 1996

on advance season tickets and on private suite reservations relating to the 1998 major league baseball season.[2]

With regard to the private suite reservations, if the partnership was admitted to membership in major league baseball and if the Devil Rays did play major league baseball during the 1998 season, but if five or fewer of the Devil Rays' games were canceled, due, for example, to weather, the partnership would be required to provide the holders of private suite reservations with tickets to makeup games.

If six or more of the Devil Rays' games were canceled during the 1998 season, the partnership would be required to provide holders of private suite reservations with appropriate credits toward the purchase of private suite reservations for the following season.

During 1995, the partnership adopted and followed a policy of allowing refunds to customers, upon their request, of deposits made for advance season tickets and for private suite reservations relating to expected games of the Devil Rays to be played in the 1998 major league baseball season. During 1995,

---

[2] The conditional nature of the partnership's right to retain the deposits for advance season tickets and private suite reservations was implicitly acknowledged by respondent in his proposed findings of fact by stating conversely as follows:

> [The partnership] was assured that, so long as it fulfilled its contractual obligation to play baseball games in 1998 [the partnership] could keep the payments.

the partnership made refunds to customers relating to the 1998 major league baseball season in the total amount of $260,010 from deposits received on advance season tickets and $35,000 from deposits received on private suite reservations.

In 1996, the partnership received a $125,000[3] sponsor fee that was used to convert a large truck into a mobile exhibit to promote the Devil Rays.  The exhibit was completed in 1997, and it was promoted as "The Devil Rays' Express".

Funds that the partnership received during 1995 and 1996 relating to advance season tickets, to private suite reservations, and to the sponsor fee were used by the partnership during 1995 and 1996 for general operating purposes.

Set forth below are the total funds the partnership received in 1995 and in 1996 as deposits on advance season tickets and on private suite reservations, and as a sponsor fee, relating to the partnership's and to the Devil Rays' anticipated participation in the 1998 major league baseball season:

| Year | Deposits On | | Sponsor Fee |
| | Advance Season Tickets | Private Suites | |
| --- | --- | --- | --- |
| 1995 | $2,906,401 | $ 449,807 | -- |
| 1996 | 1,932,182 | 1,640,500 | $125,000 |

---

[3]    An additional $175,000 also received in 1996 as a sponsor fee is not in issue.

On March 31, 1998, the Devil Rays played its first major league baseball game against the Detroit Tigers and lost the game 11 to 6. The Devil Rays apparently played all its scheduled major league baseball games for 1998 on their scheduled dates.

In 1998, the partnership began incurring significant additional expenses (that it had not incurred in prior years) relating to its first season in major league baseball. Substantially all the additional expenses relating directly to the major league baseball games the Devil Rays played in 1998 were incurred in 1998 (e.g., player salaries, stadium rental, and game-day operations).

For financial and tax purposes, the partnership maintains its books and records on the accrual method of accounting.

On its financial books and records for 1995 and 1996, taking into account yearend adjusting entries, the partnership treated the deposits it received in 1995 and in 1996 on advance season tickets and on private suite reservations as deferred revenue (i.e., as liabilities, not as income).

On its Federal partnership tax returns for 1995 and 1996, the partnership treated expenses relating to its minor league baseball activities and to general operating and overhead costs as current business expense deductions.[4]

---

[4] The partnership did deduct on its 1995 and 1996 partnership tax returns the current year annual interest expense relating to the loan obtained to pay the $130 million franchise fee.

On its Federal partnership tax returns for 1995 and 1996, the partnership did not deduct as accrued expenses any of the anticipated expenses relating directly to the major league baseball games to be played by the Devil Rays in 1998 (e.g., major league baseball player salaries, stadium rental, and game-day operations).

Further, on its 1995 and 1996 Federal partnership tax returns, the partnership did not accrue business expense deductions of $27,753 and $8,500 incurred in 1995 and 1996, respectively, relating to the marketing and sale in 1995 and 1996 of advance season tickets and private suite reservations. Rather, those expenses were deferred and deducted on the partnership's 1998 Federal partnership tax return for 1998, the year in which the games were played.

On its Federal partnership tax returns for 1995 and 1996, the partnership did not include in income the deposits the partnership received during 1995 and 1996 (on the advance season tickets and on the private suite reservations relating to the anticipated 1998 major league baseball season). Rather, the deposits received in 1995 and 1996 on the advance season tickets and on the private suite reservations were reported by the partnership as income on the partnership's Federal partnership tax return for 1998, the year in which the Devil Rays played the

games to which the advance season tickets and the suite reservations related.

The $125,000 sponsor fee received in 1996 was reported as income on the partnership's 1997 Federal partnership tax return.

The funds the partnership received in 1996 from major league baseball in connection with third-party licenses of major league baseball names, logos, and emblems were reported as income on the partnership's Federal partnership tax return for 1996.

No portion of the $130 million franchise fee (fully paid by the partnership prior to 1998) was deducted or amortized by the partnership for Federal partnership tax purposes until 1998, the year in which the Devil Rays began playing major league baseball games. In 1995, 1996, and 1997, the partnership capitalized the $130 million franchise fee. The $74,725,000 portion of the franchise fee that the partnership allocated to player contracts the partnership amortized and deducted over the lives of the player contracts, beginning in 1998, the year in which the Devil Rays played its first game. For 1998, the partnership deducted $18,764,389 as amortization on the $74,725,000 allocated to the player contracts.

On audit, respondent treated the deposits the partnership received in 1995 and in 1996 on advance season tickets and on private suite reservations as income to the partnership for 1995

and 1996.  Respondent treated the $125,000 sponsor fee received in 1996 as income to the partnership for 1996.

OPINION

Section 451 provides the general rule that items of income are to be included in taxpayers' income in the year of receipt, unless the items of income are properly includable in a different year under the taxpayers' method of accounting.  Section 446 provides generally that taxpayers are to compute taxable income using the method of accounting that they use in computing income for book purposes, unless such method does not clearly reflect income.

Under section 446(c), the accrual method is a permissible method of accounting.  Sec. 446(c)(2).

Specifically, under the accrual method of accounting, where funds are received by taxpayers as deposits on services to be rendered in the future the funds generally are to be included in the taxpayers' income in the year of receipt, as opposed to being deferred until the year in which taxpayers perform the related services.  See Schlude v. Commissioner, 372 U.S. 128 (1963); AAA v. United States, 367 U.S. 687 (1961); Auto. Club of Mich. v. Commissioner, 353 U.S. 180 (1957).

In both Auto. Club of Mich. v. Commissioner, supra (Auto. Club), and AAA v. United States, supra, accrual basis taxpayers included prepaid membership dues they received in income ratably

over the 12-month period covered by the membership agreements, which at times extended beyond the year in which the dues were received.  The Supreme Court held in both <u>Auto. Club</u> and <u>AAA</u> that the taxpayers' deferral of the prepaid membership dues did not clearly reflect the taxpayers' income and that the dues should be included in the taxpayers' income in the year of receipt.  <u>AAA v. United States</u>, <u>supra</u> at 694-695, 698; <u>Auto. Club of Mich. v. Commissioner</u>, <u>supra</u> at 189-190.  The Supreme Court noted the "artificial" nature of accruing advance dues in income on a 12-month ratable basis and over two periods where performance of the services to be rendered by the taxpayers was indefinite and uncertain (i.e., where no fixed dates for performance of the services were specified and where the specific services for which the funds were received were to be performed by the taxpayers only upon customer demand).  <u>AAA v. United States</u>, <u>supra</u> at 690-691; <u>Auto. Club of Mich. v. Commissioner</u>, <u>supra</u> at 189-190.

In <u>Schlude v. Commissioner</u>, <u>supra</u>, a taxpayer received funds as advance payments on dance lessons to be given at unspecified times in the future to be determined by the students.  In requiring the taxpayer to include the funds in income in the year of receipt, the Supreme Court relied upon its prior decisions in <u>Auto. Club</u> and <u>AAA</u>, focusing on the uncertainty as to when the dance lessons were to be given.  <u>Schlude v. Commissioner</u>, <u>supra</u> at 135-137.

Artnell Co. v. Commissioner, 400 F.2d 981 (7th Cir. 1968), acq. 1968-2 C.B. 1, revg. and remanding 48 T.C. 411 (1967), involved facts very similar to those involved herein. Therein the Court of Appeals for the Seventh Circuit concluded that funds received by the Chicago White Sox, Inc. (White Sox) on advance ticket sales relating to major league baseball games to be played in a following year may appropriately be deferred and included in the White Sox's income in the year when the games were to be played if that deferral would clearly reflect the White Sox's income. Id. at 985. The Court of Appeals for the Seventh Circuit remanded the case to us for analysis of whether the White Sox's deferral of reporting the funds as income until the year in which the games were played would clearly reflect income. Id. at 985-986.

On remand in Artnell Co. v. Commissioner, T.C. Memo. 1970-85, we concluded that the White Sox's method of accounting for the funds clearly reflected income because deferral of the funds until the year in which the games were played more clearly than respondent's method matched the income with the White Sox's major expenses that were incurred in the year when the games were played.

In subsequent opinions, we have stated that Artnell Co. will be limited to its facts. See Johnson v. Commissioner, 108 T.C. 448, 492 (1997), affd. in part, revd. in part, and remanded on

another issue 184 F.3d 786 (8th Cir. 1999); <u>T.F.H. Publications,</u>
<u>Inc. v. Commissioner</u>, 72 T.C. 623, 644-645 (1979), affd. without
published opinion 622 F.2d 579 (3d Cir. 1980); see also
<u>Chesapeake Fin. Corp. v. Commissioner</u>, 78 T.C. 869, 880-882
(1982); <u>Standard Television Tube Corp. v. Commissioner</u>, 64 T.C.
238, 242 (1975).

We agree with petitioner that the facts before us in the
instant case fall within the narrow fact pattern of <u>Artnell Co.</u>

If played, the Devil Rays' games would be played in 1998
according to a fixed and definite schedule.  Had any games been
postponed, the Devil Rays would have played makeup games on fixed
dates in 1998, to which makeup games the season tickets and the
suite reservations would have been applicable.  The partnership's
major expenses of operating the Devil Rays and playing major
league baseball were incurred in 1998.

If the partnership and the Devil Rays had never received
final approval to participate in major league baseball for the
1998 season, the partnership never would have incurred the major
expenses of operating a major league baseball team.  The
partnership would have been required to refund the deposits on
advance season tickets and on private suite reservations.  The
deposits and refunds would have been a wash.

On the facts before us involving deposits received for major
league baseball games to be played by the Devil Rays in 1998,

with no major league baseball games played by the Devil Rays until 1998, and the related expenses incurred by the partnership in 1998,[5] the application of Artnell Co. is appropriate. The partnership's deferral of reporting the deposits in income until 1998, the first year in which the Devil Rays played major league baseball games, more clearly matches the partnership's related expenses that were incurred and deducted in 1998. The partnership may defer until 1998 reporting as income the deposits received in 1995 and 1996 on the advance season tickets and on the private suite reservations.

Commissioner v. Indianapolis Power & Light Co., 493 U.S. 203 (1990), on which respondent relies, concerns whether deposits received by a utility company constituted taxable advance payments of income or nontaxable security deposits. It does not require a different result in this case. Therein, the Supreme Court held that because a taxpayer was required to return deposits to customers upon termination of service or upon verification of the customers' creditworthiness, the security deposits did not constitute taxable income. Id. at 204-205, 214. As presented to us by the parties, the question herein is not whether the deposits the partnership received in 1995 and 1996

---

[5] The $130 million franchise fee was incurred before 1998 but as indicated it was capitalized, and no amortization of the portion allocable to player salaries was begun until 1998. Respondent does not contest this treatment.

constitute income to petitioner, but rather when the deposits should be included in the partnership's income under the clear reflection of income standard of section 446.

Respondent notes the partnership's deduction in 1995 and 1996 of expenses relating to its minor league baseball operation, to general operations, and to interest on the financing obtained to pay the $130 million franchise fee.  We agree with petitioner that the partnership's deduction in years prior to 1998 of minor league baseball expenses, of general startup operating expenses, and of current year interest expense is not inconsistent with the deferral until 1998 of deposits relating specifically to the Devil Rays' 1998 major league baseball season.

With regard to the $125,000 sponsor fee that the partnership received in 1996, the evidence is incomplete and does not adequately establish any basis for deferring the sponsor fee to 1998.  We sustain respondent's determination that the sponsor fee should be included in petitioner's income when received in 1996.

Decision will be entered

under Rule 155.