Versión para imprimir



EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Eileen Llorens Becerra<br><br>Peticionario<br><br>v.<br><br>Ildefonso Mora Monteserín<br><br>Recurrido | Certiorari<br><br>2010 TSPR 72<br><br>178 DPR \_\_\_\_ |

Número del Caso: CC-2007-872

Fecha: 12 de mayo de 2010

Tribunal de Apelaciones:

     Región Judicial de San Juan

Jueza Ponente:    Hon. Emmalind García García

Abogada de la Parte Peticionaria:

    Lcda. Beatríz Vázquez Acarón

Abogado de la Parte Recurrida:

    Lcdo. Fidel Vélez Arcelay

Materia: Alimentos

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correccione s del proceso de compilación y publicación oficial de las decisio nes del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Eileen Llorens Becerra

    Peticionaria

        v.                  CC-2007-872

Ildefonso Mora Monteserín

    Recurrido

Opinión del Tribunal emitida por la Juez Asociada señora Rodríguez Rodríguez

San Juan, Puerto Rico, a 12 de mayo 2010

El caso ante nuestra consideración presenta varias controversias relacionadas con el concepto de ingreso bruto aplicable en el contexto de la fijación de una pensión alimentaria para beneficio de un menor alimentista. De una parte, tenemos la oportunidad de resolver si, en dicho contexto, constituye parte del ingreso bruto de la madre custodio: el dinero que ésta obtuvo por un préstamo hipotecario o el aumento en el valor del inmueble con el que se garantizó dicha obligación prestataria. Además, debemos resolver si –por disposición de las Guías para Determinar y Modificar

Pensiones Alimentarias en Puerto Rico de 1989- para establecer el ingreso bruto de un alimentante que trabaja "por cuenta propia", deben restarse como gastos ordinarios y necesarios aquellos deducibles para fines contributivos. En tercer lugar, debemos evaluar si procede intervenir con la partida de honorarios de abogado que el foro primario concedió en favor de las menores alimentistas.

Veamos los hechos que originan las controversias que están ante la consideración de este Tribunal.

## I.

El 4 de marzo de 1996, la señora Eileen Llorens Becerra (en adelante la señora Llorens) presentó una demanda sobre reclamación de alimentos en representación de sus dos hijas menores, las cuales procreó con el demandado, el señor Ildefonso Mora Monteserín (en adelante señor Mora). El 12 de diciembre de ese mismo año, el Tribunal de Primera Instancia fijó una pensión provisional de $800 mensuales, la cual sería efectiva desde el 1 de diciembre de 1996. Posteriormente, el tribunal modificó la pensión alimentaria provisional para aumentarla a $1,357.27. Dicha modificación sería efectiva desde el 1 de diciembre de 1998.

Transcurridos casi diez (10) años desde que se presentó la demanda, el 3 de noviembre de 2005, el Tribunal de Primera Instancia dictó una sentencia parcial por estipulación de las partes. Mediante dicha sentencia dispuso que, conforme a lo estipulado, quedaría satisfecha

la obligación alimentaria del señor Mora para el periodo comprendido desde el 1 de enero de 2000. Tras emitirse la sentencia por estipulación, la controversia en el pleito quedó limitada a establecer la obligación alimentaria del señor Mora para el periodo comprendido desde el 4 de marzo de 1996, hasta el 31 de diciembre de 1999.

El foro primario celebró una vista evidenciaria, la cual se extendió por varios días, para recibir prueba referente a la controversia que quedó pendiente de adjudicar. En la vista sólo se presentó como testigo a la señora Llorens quien testificó, entre otros aspectos, sobre sus ingresos y los gastos personales de ella y sus hijas, según surgían de sus planillas de información personal y económica, y de las planillas de contribución sobre ingresos que presentó desde el 1996 hasta el 1999. Particularmente, las planillas de contribución sobre ingresos fueron ofrecidas en evidencia, y admitidas por estipulación de las partes, a los efectos de que incluían los ingresos y gastos informados por la señora Llorens.

Surge de las planillas de contribución sobre ingresos admitidas en evidencia que para 1996 la señora Llorens informó que obtuvo un ingreso anual de $9,766 como empleada de American Airlines. Además, en el anejo correspondiente a los ingresos de industria o negocio, informó que obtuvo un ingreso anual de $2,836 producto de venta de ropa. En segundo lugar, para el 1997 la señora Llorens informó los siguientes ingresos: $11,412 obtenido como empleada de

American Airlines; $1,502 producto de la venta de ropa; y $11,180 de ganancia de capital por la venta de un inmueble. Para el 1998, la señora Llorens informó el ingreso de $14,518 generado como empleada de American Airlines y el ingreso de $1,775 correspondiente al negocio de venta de ropa. Por último, para el año 1999, informó el ingreso de $15,260 obtenido como empleada de American Airlines y otro ingreso de $4,414 por ganancia de capital. Para este último año informó pérdidas de $1,132, en el negocio de venta de ropa.

Cabe mencionar que de los ingresos antes indicados, los informados en relación con el negocio de venta de ropa, constituyen las ganancias calculadas por la señora Llorens luego de que ésta dedujera ciertos gastos en los que alega incurrió para el manejo del referido negocio. Entre las deducciones informadas por la señora Llorens se encuentran partidas de gastos sobre: vehículo de motor, reparaciones, comida y entretenimiento, anuncios, depreciación, servicios públicos como agua, luz y teléfono, materiales, y otros gastos.

La representación legal del señor Mora inquirió, durante el contrainterrogatorio, sobre lo informado por la señora Llorens en sus planillas de contribución sobre ingresos. Particularmente, cuestionó el que la señora Llorens no reportara ingresos producto del arrendamiento de varios inmuebles de su propiedad. Por el contario, en las planillas de contribución sobre ingresos del 1996 al 1999

la señora Llorens reportó pérdidas en el anejo correspondiente a los ingresos por renta o alquiler.

En respuesta a las preguntas de la representación legal del señor Mora, la señora Llorens expuso que ello se debió a que los pagos de las contribuciones sobre la propiedad y de los préstamos hipotecarios, sumados a los gastos de operación informados en las planillas de contribución sobre ingresos, excedían la renta que recibía por el arrendamiento de sus propiedades. Afirmó que aunque arrendó varias propiedades durante el periodo en cuestión, dicho arrendamiento le generaba pérdidas.

Entre los gastos de operación informados por la señora Llorens, en los anejos de las planillas de contribución sobre ingreso correspondientes a ingreso por renta, se encuentran partidas de gastos por: vehículos de motor, servicios públicos como agua, luz y teléfono, tapicería, jardinería, depreciación y amortización, contribuciones sobre la propiedad, mantenimiento, materiales, anuncios, seguros y otros gastos.

Luego de celebrar la referida vista, el 31 de mayo de 2006, el Tribunal de Primera Instancia dictó sentencia. Como parte de sus determinaciones, el foro primario estableció el ingreso neto del señor Mora y de la señora Llorens para los años en los que debía fijarse la pensión. Según lo estipulado por las partes, determinó que el ingreso neto mensual del señor Mora, para los años en controversia, fue el siguiente:

1996 – $2,862.03

1997 – $4,155.89

1998 – $4,218.19

1999 – $5,901.33

De otra parte, el tribunal determinó que el ingreso neto mensual de la señora Llorens, para el mismo periodo, fue el siguiente:

1996 – $1,692.86

1997 – $8,268.25

1998 – $1,945.67

1999 – $2,688.56

Surge de la sentencia que para calcular el ingreso neto mensual de la señora Llorens el tribunal consideró el salario que ésta devengó como empleada de la línea aérea American Airlines.  A dichos ingresos el foro primario le agregó los ingresos producto de la venta de ropa y del arrendamiento de sus propiedades.

Además de los ingresos antes mencionados, para calcular el ingreso neto mensual del año 1997, el foro primario consideró $11,180 de ganancia de capital por la venta de un inmueble y **"$72,000 capitalizado por [el] refinanciamiento de dos inmuebles"**.[1]  Por otro lado, para el

---

[1] En la vista celebrada por el Tribunal de Primara Instancia, la señora Llorens declaró que en el año 1997 "refinanció" los apartamentos que constituían su hogar para sufragar sus gastos y los de sus hijas, los cuales superaban sus ingresos.  Declaró, además, que recibió $94,200 por dicho "refinanciamiento".  En la planilla de información personal de la señora Llorens, presentada el 22 de agosto de 1997, ésta declaró que entre sus pasivos u obligaciones figuraba un préstamo hipotecario, con fecha de

año 1999, el tribunal consideró como ingreso $4,414 de ganancias de capital por la venta de otra propiedad inmueble.

Cabe mencionar que en la sentencia sólo se estableció el ingreso neto mensual de la señora Llorens, sin especificar qué cantidad de éste correspondía al salario de American Airlines, a la venta de ropa y al arrendamiento de bienes inmuebles. No obstante, sí se pormenorizó la forma en que el tribunal calculó las partidas correspondientes a cada una de dichas fuentes de ingreso.

En particular, se expuso que para calcular los ingresos obtenidos como resultado del negocio de venta de ropa, el tribunal de instancia consideró el **"ingreso neto (sin gastos)"** producto de ese negocio. Así, dicho foro rechazó restar los gastos en los que la señora Llorens alega haber incurrido, según tales gastos fueron informados por ésta en sus planillas de contribución sobre ingresos.

De otra parte, para calcular los ingresos que la señora Llorens obtuvo del arrendamiento de sus propiedades, el foro primario restó las siguientes "deducciones": contribución sobre la propiedad, intereses hipotecarios, seguros y anuncios. Por el contrario, el Tribunal de Primera Instancia rechazó considerar los demás gastos que

julio de 1997, cuyo balance adeudado era $119,000. Además, informó la existencia de un préstamo hipotecario con fecha de julio de 2007 cuyo balance adeudado era $30,000. Dichas obligaciones gravaban los apartamentos G-202 y G-203 del Condominio El Monte, los cuales pertenecían a la señora Llorens y constituían el hogar de ésta y sus hijas. Desconocemos el razonamiento bajo el cual el foro primario arribó a la cantidad de $72,000.

la señora Llorens informó en sus planillas de contribución sobre ingresos.

Además de lo anterior, el Tribunal de Primera Instancia especificó en su dictamen que para determinar los ingresos de la señora Llorens no consideró las sumas de dinero que ésta recibió como préstamos tomados a amigos y familiares. De otra parte, para determinar el ingreso neto anual, el tribunal dedujo los pagos anuales por contribuciones sobre ingresos, según las planillas presentadas, y las otras deducciones autorizadas por ley. El foro primario concluyó que las cantidades resultantes concordaban con los gastos del hogar estipulados por las partes.[2]

En virtud de lo antes expuesto, el Tribunal de Primera Instancia, determinó las sumas de pensión alimentaria que debía satisfacer el señor Mora para el periodo comprendido desde el 4 de marzo de 1996 hasta el 31 de noviembre de 1999. La pensión para cada uno de los años de dicho periodo quedó establecida de la siguiente manera:

1996 – $1,255 mensuales

---

[2] En la sentencia se especificó que los gastos personales imputados al hogar de las menores y de la madre, según lo estipulado por las partes, eran los siguientes:

1996 – $3,424.40 mensuales

1997 – $3,749.93 mensuales

1998 – $3,952.39 mensuales

1999 – $4,107.26 mensuales

1999 – $4,107.26 mensuales

1997 - $1,151 mensuales

1998 - $1,601 mensuales

1999 - $2,029 mensuales

Las cantidades de pensión antes indicadas sumaban $69,800.55. El foro primario especificó que de dicha suma el señor Mora pagó $55,138.24 y, por tanto, la suma adeudada era $14,662.31. La señora Llorens solicitó reconsideración de dicha determinación.[3] En reconsideración, el Tribunal de Primera Instancia le impuso al señor Mora el pago de $5,000 por honorarios de abogado.

Inconforme aún, la señora Llorens acudió al Tribunal de Apelaciones.[4] Ante dicho foro arguyó que el Tribunal de Primera Instancia erró al emitir una sentencia carente de determinaciones de hecho y conclusiones de derecho. Además, adujo que el tribunal de instancia erró al imputarle ingresos por el refinanciamiento de un préstamo hipotecario garantizado con los inmuebles que constituían

---

[3] Además, la señora Llorens solicitó del tribunal determinaciones de hecho y de derecho adicionales, al amparo de la Regla 43.3 de las Reglas de Procedimiento Civil, 32 L.P.R.A. Ap. III. R. 43. No obstante, dicha petición se presentó transcurrido el término de diez (10) días aplicable.

[4] El señor Mora también recurrió de la determinación del foro primario. Entre otros aspectos, éste señaló ante el Tribunal de Apelaciones que el foro primario erró al no imputarle ingresos a la señora Llorens por "el incremento neto en el valor total de su patrimonio" durante el periodo para el cual se estableció la pensión. Asimismo, indicó que procedía imputarle ingresos a la señora Llorens, en los años 1996, 1998 y 1999, en virtud de su "nivel de vida". El Tribunal de Apelaciones consolidó ambos recursos y confirmó la sentencia recurrida. Inconforme, el señor Mora presentó un recurso de *certiorari* (CC-2007-0773) ante este Foro con planteamientos similares a los esbozados ante el foro intermedio. Mediante resolución de 16 de noviembre de 2007, denegamos la expedición de dicho recurso.

su hogar.  De otra parte, indicó que el foro primario erró al no reconocer como gastos ordinarios y necesarios de los negocios de alquiler de inmuebles y de la venta de ropa, aquellos que identifica como tales el Código de Rentas Internas de Puerto Rico, *infra*.  Arguyó, además, que el Tribunal de Primera Instancia fijó unos honorarios de abogado poco razonables para un proceso litigioso que se extendió por diez (10) años.  El Tribunal de Apelaciones confirmó la sentencia recurrida en todos sus aspectos pues resolvió que no procedía intervenir con las determinaciones del foro primario.

De dicha sentencia la señora Llorens acudió ante este Foro mediante recurso de *certiorari*.  En síntesis, aduce que el Tribunal de Apelaciones erró al sostener que procedía imputarle como parte de sus ingresos la suma que obtuvo producto del refinanciamiento de un préstamo hipotecario, pues dicha suma no constituye un ingreso.  En segundo lugar, arguye que el Tribunal de Apelaciones debió reconocer como gastos ordinarios y necesarios, para el arrendamiento de inmuebles y de la venta de ropa, los gastos reconocidos y aprobados como tales por el Código de Rentas Internas de Puerto Rico.  Por último, argumenta que los honorarios concedidos por el foro de instancia son irrazonables considerando que este litigio se extendió por un periodo de diez (10) años.

Por su parte, el señor Mora indica que el Tribunal de Primera Instancia no erró al considerar "$72,000

capitalizado por refinanciamiento de dos inmuebles" para calcular los ingresos de la señora Llorens. Argumenta que dicha capitalización constituyó una variable más al determinar la capacidad económica de la señora Llorens y que ello no implica que el foro primario considerara como un ingreso de ésta el dinero obtenido a préstamo por el refinanciamiento de los inmuebles que constituían su hogar. Expone que el préstamo hipotecario fue el instrumento que le permitió al foro primario cuantificar el "equity o incremento en valor de los inmuebles" para luego imputarle ingresos a la señora Llorens en virtud de su "capital o patrimonio" total.

En cuanto al segundo asunto planteado, el señor Mora aduce que el Tribunal de Primera Instancia adjudicó que la señora Llorens no incurrió en los gastos que ésta alega y que tal determinación merece deferencia. De otra parte, señala que el proceso administrativo referente a las planillas de contribución sobre ingresos, y los gastos allí informados, no obligan al Tribunal de Primera Instancia. Arguye que la señora Llorens no sustentó los gastos informados en las planillas de contribución sobre ingresos al no presentar prueba de éstos ante el foro primario. En ese tenor, señala que aunque las partes estipularon la autenticidad de las planillas de contribución sobre ingresos presentadas por la señora Llorens, no se estipuló el contenido de éstas.

Por último, el señor Mora expone en su alegato que los honorarios fijados por el Tribunal de Primera Instancia son razonables. Afirma que a pesar de que el caso estuvo pendiente ante dicho foro por diez (10) años, sin que se fijara una pensión, dicha dilación fue ocasionada por la parte demandante y por el propio tribunal.

Tras examinar los argumentos de ambas partes, procedemos a resolver.

II.

A.

El caso ante nuestra consideración presenta, nuevamente, una controversia concerniente a la obligación jurídica del padre y de la madre de prestar alimentos a sus hijos menores. Obligación que es independiente de que éstos ostenten la patria potestad o vivan en compañía del menor. *Chévere v. Levis*, 150 D.P.R. 525, 539 (2000). *Véase además*, *Martínez v. Rodríguez*, 160 D.P.R. 145, 151 (2003).

En múltiples ocasiones hemos expresado que existe un alto interés público de asegurar el cumplimiento con el referido deber toda vez que el derecho de los menores a recibir alimentos es uno consustancial a su derecho a la vida. *Chévere v. Levis*, *supra*, pág. 535. *Véanse además*, *Martínez v. Rodríguez, supra,* págs. 150-151; *Argüello v. Argüello*, 155 D.P.R. 62, 69-70 (2001) y casos allí citados. Así, viabilizar que los padres cumplan con su responsabilidad de contribuir a la manutención de sus hijos

es el propósito de la legislación y reglamentación concerniente al sustento de los menores, mediante la cual se han pautado los principios y procedimientos que regirán la fijación de la pensión alimentaria. *Martínez v. Rodríguez, supra,* pág. 152.

En primer lugar, la fijación de una cuantía de alimentos está guiada por el principio, prescrito en el artículo 146 del Código Civil, 31 L.P.R.A. sec. 565, que exige que la pensión alimentaria se establezca en proporción "a los recursos del que los da y a las necesidades del que los recibe. . .". *Véase*, *Martínez v. Rodríguez, supra,* pág. 153. Es decir, el criterio rector para determinar una pensión alimentaria es que ésta sea proporcional a los recursos económicos del alimentante y a las necesidades del alimentista. *Íd.* Así pues, hemos indicado que "[l]a determinación de la cuantía de los alimentos corresponde al prudente arbitrio [del juzgador]", quien debe velar porque la cuantía que se establezca cumpla con el principio de proporcionalidad. *Guadalupe Viera v. Morell*, 115 D.P.R. 4, 14 (1983).

Partiendo del susodicho principio de proporcionalidad es que se han adoptado, por vía estatutaria y reglamentaria, guías más precisas para dirigir la difícil labor de determinar la capacidad económica con que cuentan los padres y madres para suplir las necesidades de sus hijos. En ese tenor, la Ley Núm. 5 de 30 diciembre de 1986, según enmendada, 8 L.P.R.A. sec. 501 *et seq.,*

conocida como la Ley Orgánica para la Administración del Sustento de Menores (en adelante Ley Núm. 5), prescribe ciertas normas que rigen el proceso para fijar la pensión alimentaria. Normas cuyo propósito primordial es que se logre establecer una pensión "justa y razonable" para el beneficio del menor alimentista. Artículo 4 de la Ley Núm. 5, 8 L.P.R.A. sec. 503. *Véase además*, *Martínez v. Rodríguez, supra,* págs. 152-154. Siguiendo las normas establecidas en la Ley Núm. 5, se promulgaron las *Guías para Determinar y Modificar Pensiones Alimentarias en Puerto Rico*, Reglamento Núm. 4070 del Departamento de Servicios Sociales, 8 de diciembre de 1989, (en adelante Guías de 1989).[5]

En *Martínez v. Rodríguez* discutimos el proceso evaluativo establecido en la Ley Núm. 5 y en las Guías de 1989 para determinar la capacidad económica del alimentante[6] y lograr fijar una pensión alimentaria razonable a la luz de los recursos de éste y de las necesidades del alimentista. En síntesis, dicho procedimiento requiere que se determine el ingreso bruto del alimentante para luego establecer su ingreso neto.

---

[5] Las Guías de 1989 quedaron derogadas por las *Guías para Determinar y Modificar las Pensiones Alimentarias en Puerto Rico* aprobadas mediante el Reglamento 7135 del Departamento de la Familia, de 23 mayo de 2006 (en adelante Guías de 2006). Para el periodo objeto de la presente controversia aplican las Guías de 1989. *Véase, Torres v. Carrasquillo,* res. 29 de diciembre de 2009, 2009 T.S.P.R. 187, 177 D.P.R. __ (2009).

[6] La Ley Núm. 5, en su artículo 2(4), define alimentante como "[c]ualquier persona que por ley tenga la obligación de proveer alimentos y cubierta de seguro médico". 8 L.P.R.A. sec. 501.

*Íd.*, pág. 156. Además del ingreso neto, se considerará el capital o patrimonio total del alimentante para fijar la pensión alimentaria que éste debe satisfacer. Artículo 19 de la Ley Núm. 5, 8 L.P.R.A. sec. 518. *Véanse además*, *Martínez v. Rodríguez*, *supra*, pág. 156, esc.12; Sarah Torres Peralta, *La Ley de Sustento de Menores y el Derecho Alimentario en Puerto Rico*, San Juan, Puerto Rico, Pubs. STP, 2007, pág. 8.06.

Como parte del referido proceso evaluativo, es necesario determinar tanto la capacidad económica del padre o madre no custodio como la del padre o de la madre custodio, toda vez que ambos están obligados a prestar alimentos de forma proporcional a sus recursos. *López v. Rodríguez,* 121 D.P.R. 23, 29 (1988), citando a *Vega v. Vega,* 85 D.P.R. 675, 679 (1962). En lo que respecta al padre o a la madre custodio[7], el artículo 19 de la Ley Núm. 5, 8 L.P.R.A. sec. 518, dispone que para determinar su capacidad económica, "y el cómputo proporcional a serle imputado", deben considerarse iguales criterios que los utilizados para fijar capacidad económica del padre o la madre no custodio.

Según expusimos previamente, el caso ante nuestra atención concierne a la aplicación del referido proceso evaluativo para determinar los ingresos de la señora Llorens como madre custodio. Particularmente, la señora

---

[7] La Ley Núm. 5, en su artículo 2(25), define la persona custodio como aquella "que puede ser un padre, madre, pariente o tutor responsable del cuido diario del alimentista y administradora de los bienes de éste." *Íd.*

Llorens aduce que no debió agregarse como parte de sus ingresos el dinero que obtuvo por un préstamo que realizó en el año 1997, el cual estaba garantizado con una hipoteca constituida sobre el inmueble en el que residía junto a sus hijas. Además, arguye que al calcular los ingresos que recibió por el arrendamiento de sus propiedades y por la venta de ropa, debieron considerarse y descontarse como gastos necesarios para producir tales ingresos aquellos que informó en las planillas de contribución sobre ingresos.

Examinaremos, primeramente, si el foro recurrido erró al confirmar la determinación del Tribunal de Primera Instancia de incluir "$72,000 capitalizado por [el] refinanciamiento de dos inmuebles" como un ingreso de la señora Llorens. Tal controversia requiere referirnos a la definición de ingreso bruto incluida en la Ley Núm. 5.

B.

Tal y como señaláramos anteriormente, "[l]os conceptos de ingreso bruto y de ingreso neto [según definidos en la Ley Núm. 5] son esenciales en materia de la determinación de la pensión alimentaria a ser establecida o modificada para beneficio de la parte alimentista". Torres Peralta, *op. cit.*, pág. 8.05. *Véase, Martínez v. Rodríguez, supra.* Ello porque, según adelantamos, el primer paso para determinar la capacidad económica del alimentante es

calcular su ingreso bruto, el cual, en virtud del artículo 2(16) de la Ley Núm. 5, 8 L.P.R.A. sec. 501 (16)[8], incluye:

> cualquier ganancia, beneficio, rendimiento o fruto derivado de sueldos, jornales o compensación por servicios personales,. . .; o de profesiones, oficios, industrias, negocios, comercio o ventas; o de operaciones en propiedad, bien sea mueble o inmueble, que surjan de la posesión o uso del interés en tal propiedad; también los derivados de intereses, rentas, dividendos, beneficios de sociedad, valores o la operación de cualquier negocio explotado con fines del lucro o utilidad; y ganancias, beneficios, rendimientos, fondos, emolumentos o compensación derivados de cualquier procedencia, incluyendo compensaciones como contratista independiente, compensaciones por desempleo, compensaciones por incapacidad, beneficios de retiro y pensiones o cualquier otro pago que reciba un alimentante de cualquier persona natural o jurídica.

Luego de determinar el ingreso bruto, según éste se conceptúa en la definición antes transcrita, procede calcular el ingreso neto restando del ingreso bruto las deducciones mandatorias establecidas por ley. *Martínez v. Rodríguez*, *supra*, págs. 155-157. Así surge del artículo 2(17) de la Ley Núm. 5, 8 L.P.R.A. sec. 501, que define el ingreso neto como "[a]quellos ingresos disponibles al alimentante, luego de las deducciones por concepto de contribuciones sobre ingreso, seguro social, y otras requeridas mandatoriamente por ley".[9] *Véase además*, el

---

[8] La definición de ingreso bruto de la Ley Núm. 5 se incorporó en el artículo V(B)(1) de las Guías de 1989.

[9] Además, el artículo 2(17) de la Ley Núm. 5, 8 L.P.R.A. 501, permite que se tomen en consideración otras deducciones "por concepto de planes de retiro, asociaciones, uniones y federaciones voluntarias, así como los descuentos a pagos por concepto de primas de pólizas de seguros de vida, contra accidentes o servicios de salud

artículo V(B)(1) de las Guías de 1989. De otra parte, el citado artículo indica que "[l]a determinación final [sobre el ingreso neto] se hará según toda la prueba disponible, incluyendo estimados, estudios y proyecciones de ingresos, gastos, estilo de vida y cualquier otra prueba pertinente". *Íd.*

Tal y como hemos expuesto, establecer el ingreso bruto constituye el primer paso a seguir para determinar el ingreso neto y, la capacidad económica con que cuentan los obligados a prestar alimentos. Al expresarse sobre la definición de ingreso bruto incluida en la Ley Núm. 5, Torres Peralta enfatiza que dicho concepto es uno abarcador que debe interpretarse ampliamente de forma tal que, en la determinación inicial de lo que constituye ingreso, se consideren "todos los emolumentos que recibe el alimentante, sin exclusión alguna[,]… independientemente de cu[á]l es la fuente de la que provienen los ingresos del alimentante". *Op. cit.*, pág. 8.14.[10] Dicha interpretación

_____

cuando el alimentista sea beneficiario de éstos". *Véase*, *Martínez v. Rodríguez*, *supra*, págs. 155-157.

[10] El artículo 7(A)(1)(a) de las Guías del 2006, establece que: "Para determinar el ingreso bruto anual de la persona custodia y de la no custodia se considerarán todas las formas de ingreso incluidas en la definición de *Ingreso* de [dicho] Reglamento. No se considerarán ingresos, los beneficios provenientes del programa de Asistencia Temporal a Familias Necesitadas (TANF), Categoría C, ni los pagos recibidos al amparo del Programa de Asistencia Nutricional (PAN)." Torres Peralta expone que, según su criterio, las exclusiones de la citada disposición no son de carácter taxativo. Sugiere que, por ejemplo, además de las partidas allí mencionadas los dineros obtenidos de préstamos estudiantiles sean excluidos del concepto ingreso. *Op. cit.*, págs. 4.40-4.41, 8.11-8.13. *Cf.*, *Gilberston v.*

extensiva del concepto ingreso responde al propósito de la Ley Núm. 5 de asegurar el bienestar del menor alimentista y el derecho de éste a recibir alimentos en proporción a sus necesidades y a los recursos reales de quienes están obligados a brindarle alimentos. Así, el artículo 3 de la Ley Núm. 5, 8 L.P.R.A. sec. 502, establece que las disposiciones de dicha ley deben interpretarse liberalmente a favor de los mejores intereses del menor que necesita alimentos.

A la luz de lo anterior, nos corresponde interpretar la definición de ingreso bruto incluida en la Ley Núm. 5 para determinar si la señora Llorens generó un ingreso en virtud del "refinanciamiento" de los inmuebles que constituían su hogar. Toda vez que dicha controversia implica un préstamo, garantizado con ciertas propiedades inmuebles, es pertinente considerar algunos aspectos básicos referentes a esta obligación contractual. Específicamente, el artículo 1631 del Código Civil, 31 L.P.R.A. sec. 4511, prescribe que mediante dicho contrato:

> una de las partes entrega a la otra, o alguna cosa no fungible para que use de ella por cierto tiempo y se la devuelva, en cuyo caso se llama comodato, o dinero u otra cosa fungible, con condición de [de]volver otro tanto de la misma especie y calidad, en cuyo caso conserva simplemente el nombre de préstamo.

De otra parte, el artículo 1644 del Código Civil, 31 L.P.R.A. sec. 4571, expone que "el que recibe en préstamo dinero u otra cosa fungible, adquiere su propiedad, y está

---

*Graff,* 477 N. W. 2d 771 (1991). (The excess student proceeds are a periodic and reliable source of income.)

obligado a devolver al acreedor otro tanto de la misma especie y calidad [de lo recibido]". El contrato de préstamo implica esencialmente un "aspecto obligacional, conformado por el compromiso de devolver otro tanto de la misma especie y calidad . . .". José Luis Concepción Rodríguez, *Derecho de contratos*, España, Ed. Bosch, S. A., 2003, pág. 375.

Así, resulta necesario considerar si, para efectos de la Ley Núm. 5, lo recibido en virtud de un contrato de préstamo constituye un ingreso, independientemente de que esté presente la obligación de restitución. En relación con dicha controversia conviene referirnos, sólo a modo ilustrativo, a la interpretación sobre la definición de ingreso bruto de la Ley Núm. 91 del 29 de junio de 1954, según enmendada, conocida como Ley de Contribuciones sobre Ingresos de 1954,[11] toda vez que dicha definición incluía una redacción muy similar a la del concepto ingreso de Ley Núm. 5. Específicamente, la sección 22(a) de la Ley de Contribuciones sobre Ingresos de 1954[12] disponía que el ingreso bruto incluiría:

> ganancias, beneficios e ingresos derivados de sueldos, jornales, o compensación por servicios profesionales . . . de cualquier clase y cualquiera que sea la forma en que se pagaren; o de profesiones, oficios, industrias, negocios, comercio o ventas; o de operaciones en propiedad, bien sea mueble o inmueble, que surjan de la posesión o uso o del interés en tal propiedad;

---

[11] Aunque la Ley de Contribuciones sobre Ingresos de 1954 fue derogada, la definición de ingreso bruto de dicho estatuto se mantiene en la sección 1022 del Código de Rentas Internas de 1994, 13 L.P.R.A. sec. 8422, vigente.

[12] 13 L.P.R.A. sec. 3022 (1976).

también los derivados de intereses, rentas , dividendos, beneficios de sociedades, valores o la operación de cualquier negocio explotado con fines de lucro o utilidad; y ganancias o beneficios e ingresos derivados de cualquier procedencia.

Según expone Genovevo Meléndez Carrucini, la citada definición, adoptada del Código de Rentas Internas Federal de 1939, incluye una enumeración extensa y detallada de partidas que constituyen ingreso. Genovevo Meléndez Carrucini, *Ingreso tributable: inclusiones y doctrinas*, 1ra edición, San Juan, Puerto Rico, Instituto de Contribuciones de Puerto Rico, Inc., 1991, págs. 149-152. Al igual que la definición de ingreso incluida en la Ley Núm. 5, la definición de la Ley de Contribuciones sobre Ingresos de 1954 se redactó en un "sentido amplio y abarcador". *Véase*, *Orsini v. Secretario de Hacienda*, res. 8 de diciembre de 2009, 2009 T.S.P.R. 190, 177 D.P.R. __ (2009), citando a G. Meléndez Carrucini, *Ingreso no tributable: exclusiones y doctrinas*, 1ra edición, Instituto de Contribuciones de Puerto Rico, Inc., San Juan, Puerto Rico, 1994, págs. 57-58. Ahora bien, el lenguaje amplio utilizado por el legislador al definir el ingreso bruto, no implica que pueda otorgársele a dicho concepto, acudiendo al principio de una interpretación extensiva, un alcance irrazonable que resulte contrario a la intención legislativa. *Orsini v. Secretario de Hacienda, supra.*

Por ello, a pesar de la amplitud del lenguaje con el cual se define el concepto ingreso bruto, se confrontan con frecuencia dificultades "en la caracterización de partidas

en cuanto a si son o no 'ingreso'" para fines contributivos. Meléndez Carrucini, *Ingreso tributable: inclusiones y doctrinas, op. cit.,* pág. 152. En ese tenor, Meléndez Carrucini discute que la jurisprudencia federal es ejemplo de los numerosos debates referentes a la definición de ingreso. *Íd.,* pág. 171. Dicha jurisprudencia puede resultar particularmente ilustrativa al interpretar la definición de ingreso bruto incluida en los estatutos sobre contribuciones de Puerto Rico, toda vez que el sistema de tributación de dicha legislación se adoptó siguiendo el modelo estadounidense. *Íd.,* pág. 173.

En lo pertinente a la controversia ante nuestra atención, en el contexto contributivo, la jurisprudencia federal ha resuelto que lo obtenido en virtud de un préstamo no constituye ingreso. En *James v. United States*, 366 U.S. 213, 219 (1961), el Tribunal Supremo de Estados Unidos reafirmó la norma de que un préstamo no constituye un ingreso al expresar lo siguiente: "When a taxpayer acquires earnings, lawfully or unlawfully, without the consensual recognition, express or implied, of an obligation to repay and without restriction as to their disposition, he has received income . . . This standard brings wrongful appropriations within the broad sweep of "gross income"; it excludes loans." (Citas internas omitidas.) *Véanse además, Commissioner v. Indianapolis Power & Light Co.*, 493 U.S. 203, 207-208 (1990); *Commissioner v. Tufts*, 461 U.S. 300, 307 (1983). ("When a

taxpayer receives a loan, he incurs an obligation to repay that loan at some future date. Because of this obligation, the loan proceeds do not qualify as income to the taxpayer.")

Al igual que lo ha interpretado la jurisprudencia federal, en el ordenamiento contributivo puertorriqueño el dinero obtenido a préstamo no constituye un ingreso.[13] Así, en presencia de un pacto de restituir lo recibido, como ocurre en el contrato de préstamo, lo obtenido no constituye un ingreso tributable. *Fernández v. Secretario de Hacienda*, 95 D.P.R. 429, 432 (1967).[14] ("El factor más importante en la solución del problema que confrontamos es la intención con que se efectuaron los retiros, y más concretamente, si al momento de realizarse se tenía o no la intención de reintegrarlos".) *Véase*, Meléndez Carrucini,

---

[13] Aunque para fines contributivos lo obtenido en virtud de un contrato de préstamo no constituye ingreso, en algunas circunstancias, cuando parte de la obligación del deudor es cancelada puede considerarse que éste recibe ingresos en un monto igual a la porción de la deuda que ha sido cancelada. Meléndez Carrucini, *Ingreso tributable: inclusiones y doctrinas*, *op. cit.*, págs. 213-214. Para una aplicación de lo anterior en el contexto de la fijación de una pensión alimentaria, véase, *e.g.*, *In the matter of Thimothy Sullivan*, 159 N. H. 251 (2009).

[14] En *Fernández v. Secretario de Hacienda*, el demandante alegaba que ciertos fondos retirados de una corporación íntima, en la cual éste figuraba como presidente y principal accionista, constituían un préstamo y no el pago de dividendos informales o implícitos. En el caso de que fueran dividendos implícitos, los fondos recibidos constituían un ingreso tributable. *Véase también*, *Viñas Sorba et. al v. Secretario de Hacienda*, 97 D.P.R. 282 (1969). Torres Peralta entiende que, igualmente, en el contexto de la fijación de una pensión alimentaria, un préstamo legítimo a un accionista no forma parte de su ingreso bruto, mas sí constituye un ingreso el pago de dividendos implícitos. *Op. cit.*, pág. 10.63.

*Ingreso tributable: inclusiones y doctrinas*, *op. cit.*, págs. 488- 491.

A pesar de que la definición de ingreso de la Ley Núm. 5 incluye una redacción casi idéntica a la Ley de Contribuciones sobre Ingresos de 1954, la interpretación del concepto ingreso que hemos discutido tiene un carácter meramente ilustrativo en lo que respecta a la controversia ante nuestra consideración. El alto interés público de asegurar el bienestar de los menores alimentistas y el derecho de éstos a recibir alimentos, como uno que es inherente a su derecho a la vida, podría requerir una interpretación aún más abarcadora del concepto ingreso en el contexto de la imposición de una pensión alimentaria.

Así, la interpretación que adoptemos debe ser cónsona con el propósito de la Ley Núm. 5 de asegurar el bienestar de los menores alimentistas.[15] A su vez, la interpretación del concepto ingreso debe concordar con el principio de proporcionalidad que rige la fijación de una pensión alimentaria. Debemos pues resolver si los principios y propósitos de la Ley Núm. 5, así como la reglamentación aplicable, requieren una interpretación más amplia de la definición de ingreso que la que opera en el contexto contributivo, de forma tal que se considere incluido dentro

---

[15] *Véase*, Torres Peralta, *op. cit.*, pág. 8.31. *Véase además*, ilustrativamente, *Shearn v. Shearn,* 50 Conn. App. 225 (1998), en donde se rechazó adoptar una interpretación de ingreso imperante en el ámbito contributivo porque dicha interpretación era contraria a lo expresamente dispuesto en la reglamentación aplicable al contexto de la fijación de una pensión alimentaria.

de dicho concepto el dinero obtenido en virtud de un contrato de préstamo. Resolvemos que no.

Si bien el concepto ingreso incluido en la Ley Núm. 5 es uno abarcador y que requiere una interpretación amplia en favor del derecho del menor alimentista, las inclusiones bajo dicho concepto deben, a su vez, representar ganancias, beneficios, rendimiento o frutos con los que realmente cuente el alimentante, de forma tal que se establezca una pensión justa y razonable. Adoptar la interpretación de que el dinero recibido a préstamo constituye un ingreso, a pesar de la obligación de restituirlo, implicaría imputar una situación económica irreal al obligado a prestar alimentos y, por tanto, ello sería contrario al principio de proporcionalidad imperante en materia de fijación de alimentos. Consecuentemente, concluimos que no incluir directamente como ingreso el dinero obtenido a préstamo, en el contexto de la aplicación de la Ley Núm. 5, constituye la norma que concuerda con el principio de proporcionalidad que rige en materia de fijación de una pensión alimentaria.

La conclusión a la cual arribamos no lesiona el derecho de los menores alimentistas a obtener una pensión que se ajuste tanto a sus necesidades como a la capacidad económica del obligado a prestarle alimentos. En ciertas circunstancias, las obligaciones prestatarias del alimentante pueden constituir un factor a considerar para fijar una pensión, si dichas obligaciones son indicativas de que éste recibe ingresos mayores a los informados o

tiene una capacidad económica mayor a la que alega. Ello es posible, según discutiremos posteriormente, mediante la aplicación de la doctrina de imputación de ingresos.

C.

Precisamente, el argumento del señor Mora es que, en el presente caso, el Tribunal de Primera Instancia acudió a la doctrina de imputación de ingresos al agregar como un ingreso de la señora Llorens los $72,000 obtenidos por el refinanciamiento de sus propiedades. Expone que no se trata de que el dinero obtenido a préstamo constituyera automáticamente un ingreso de ésta, sino que el préstamo hipotecario sirvió de instrumento para cuantificar el "equity o incremento en valor" de los inmuebles pertenecientes a la señora Llorens para imputarle ingresos a ésta en virtud de su capital o patrimonio total.

Con relación a dicho planteamiento, primeramente, debemos examinar si el aumento en valor de las propiedades constituye parte del ingreso bruto bajo la Ley Núm. 5. Sobre este asunto, conviene acudir nuevamente, y a modo ilustrativo, a la norma establecida en el contexto contributivo.

Aunque en el referido contexto el incremento en valor de una propiedad podría calificar como un beneficio, no se considera que se ha recibido o devengado, como tal, un ingreso "hasta tanto el beneficio o la ganancia se realiza". Meléndez Carrucini, *Ingreso tributable: inclusiones y doctrinas*, *op. cit.*, págs. 185-186. Lo

anterior es resultado de la aplicación de la doctrina de realización de ingresos ("realization of income"), la cual incluye como principio que "[e]l mero incremento en valor de una propiedad, o la expectación de una ganancia, no es ingreso hasta tanto se dispone de la propiedad o se recibe o devenga el ingreso".[16] *Íd.*, pág. 185.

Meléndez Carrucini explica que, en virtud de la doctrina de realización de ingresos, aunque una propiedad aumente en su valor, "no [s]e ha realizado la ganancia que representa el incremento en valor y por lo tanto [el propietario] no tiene que declarar como ingreso dicho incremento en valor. . . aunque derive algunas ventajas del nuevo valor aumentado de la propiedad. . .". *Íd.*, pág. 186. Una ventaja sería, por ejemplo, que el propietario tome un préstamo garantizado con hipoteca sobre el inmueble que ha aumentado en valor. Aunque se obtenga una ventaja como ésta, se requeriría la venta o disposición del bien para la realización de la ganancia, lo cual no ocurre al tomar dinero a préstamo garantizando la obligación contraída con una hipoteca sobre el bien inmueble. *Íd.* Así, el incremento en valor de una propiedad no implica automáticamente la realización de un ingreso.

Expuesto lo anterior, debemos resolver si, en el contexto de la Ley Núm. 5, la aplicación de la doctrina de realización de ingresos resulta inadecuada al determinar si

---

[16] Nótese que el Tribunal de Primera Instancia aplicó esta norma al incluir como ingresos de la señora Llorens para los años 1997 y 1999 las ganancias que esta obtuvo por la venta de dos inmuebles.

el aumento en el valor de una propiedad constituye un ingreso. Concluimos que la aplicación de la referida doctrina resulta apropiada, en el presente caso, pues sería irrazonable considerar directamente como ingreso una ganancia que aún no se ha realizado. Máxime cuando la alegada ganancia se trata del incremento en valor de los apartamentos que constituyen el hogar de la persona custodio y las menores alimentistas. La amplitud de la definición de ingreso incluida en la Ley Núm. 5, y la interpretación extensiva que requiere dicho concepto en beneficio del menor alimentista, no implica que debamos sostener interpretaciones que en su aplicación contravendrían el principio básico de proporcionalidad que rige la fijación de pensiones alimentarias.

D.

Lo previamente expuesto no significa que el valor de las propiedades de quien está obligado a prestar alimentos o las deudas y obligaciones prestatarias en que éste haya incurrido no puedan considerarse en forma alguna para determinar su capacidad económica. El interés de asegurar que el menor alimentista reciba una pensión justa y razonable, en protección de su derecho fundamental a la vida, exige la consideración de ciertos factores, al determinar la capacidad económica del alimentante, entre los cuales se encuentran los dos criterios antes mencionados.

De una parte, la Ley Núm. 5 permite que las propiedades con que cuentan los obligados a prestar alimentos se consideren como un factor para lograr establecer una pensión razonable que se ajuste a la capacidad económica de éstos. Según expusimos previamente, dicha ley establece que el "capital o patrimonio" se considerarán como elementos adicionales al ingreso neto, para establecer la capacidad económica del alimentante y de la persona custodio. Artículo 19 de la Ley Núm. 5, 8 L.P.R.A. sec. 518. *Véase además*, Torres Peralta, *op. cit.,* pág. 8.29.

De otra parte, la jurisprudencia de este Tribunal ha resuelto que para determinar la capacidad económica del alimentante y de la persona custodio pueden considerarse ciertos factores tales como **"el estilo de vida que lleva el alimentante, su capacidad para generar ingresos, la naturaleza y cantidad de propiedades con que cuenta**, la naturaleza de su empleo o profesión, y sus otras fuentes de ingreso". *López v. Rodríguez*, *supra*, pág. 33. (Énfasis suplido.). *Véase además*, *Argüello v. Argüello*, *supra*, págs. 73-74 (2001). Tales factores, según expusimos en *Argüello v. Argüello,* pueden servir de base para **"imputarle ingresos al alimentante razonablemente**, más allá de lo que éste alegue o intente probar sobre el particular". *Íd.,* pág. 74 (Énfasis en el original.)

Específicamente, en *Argüello v. Argüello* este Foro resolvió que los gastos mensuales en que incurre el

alimentante constituyen un factor en virtud del cual podrían imputársele ingresos, cuando tales gastos sobrepasan los ingresos informados. Sobre este particular, Torres Peralta discute que "[l]os gastos en que incurre el alimentante para sostener su estilo de vida, constituyen un elemento decisivo al determinar cuál es la verdadera situación económica del alimentante". *Op. cit.*, págs. 9.16-9.17. Por ejemplo, las cuentas altas en tarjetas de crédito podrían constituir un gasto que debe considerarse aunque luego las referidas deudas se paguen a plazos. *Íd.* De igual forma, si el alimentante ha incurrido en obligaciones prestatarias, podrían considerarse tales deudas para imputarle ingresos cuando sean indicativas de que recibe ingresos mayores a los informados u ostenta una capacidad mayor para generar ingresos.

Por otro lado, en cuanto a la imputación de ingresos por "la naturaleza y cantidad de propiedades" del alimentista, Torres Peralta comenta lo siguiente:

> La naturaleza y cantidad de propiedades que forman parte del capital del obligado y la productividad potencial de las mismas es criterio de alta importancia. Mediante la utilización de fórmulas disponibles, se puede convertir el valor de los bienes inmuebles y muebles del alimentante a un valor rental y adicionar el resultado a los ingresos del alimentante.

*Op. cit.*, pág. 9.21.

Ciertamente, acudir a ejercicios como los antes discutidos resulta en ocasiones imprescindible para lograr establecer —mediante el mecanismo de imputación de ingresos— la situación económica real del alimentante. No

obstante, de la sentencia emitida por el Tribunal de Primera Instancia en el presente caso no surge que dicho foro acudiera a la doctrina de imputación de ingresos —considerando como un factor la naturaleza y valor de las propiedades la señora Llorens— para atribuirle a ésta ingresos en el 1997. Tampoco surge que, al considerar los $72,000 como un ingreso de la señora Llorens, el foro primario lo hiciera en virtud de la capacidad de ésta para satisfacer sus deudas u obligaciones prestatarias.

Por el contrario, el Tribunal de Primera Instancia se limitó a establecer en su dictamen que, para el año 1997, constituían parte del ingreso neto de la señora Llorens "$72,000 capitalizado por [el] refinanciamiento de dos inmuebles". Es decir, el tribunal determinó que la señora Llorens realizó una ganancia de capital en virtud del "refinanciamiento" de los inmuebles que constituían su hogar. Como consecuencia de ello, el ingreso neto mensual de la señora Llorens para dicho año ascendió a $8,268.25.

Tal y como hemos determinado, no procede atribuirle automáticamente un ingreso a la señora Llorens por el hecho del "refinanciamiento" de los inmuebles que constituían su hogar. Ello, porque la obligación de restituir el dinero obtenido por el préstamo impide considerar tal partida como parte del ingreso bruto recibido por ésta. De otra parte, aunque el aumento en valor de las propiedades de la señora Llorens fuera el factor que le permitió obtener el "refinanciamiento", ello no implica que dicho aumento

constituya un ingreso realizado. En virtud de lo anterior, resolvemos que erró el Tribunal de Apelaciones al confirmar la determinación del foro primario de incluir como un ingreso de la señora Llorens "$72,000 capitalizado por [el] refinanciamiento de dos inmuebles".

III.

Resuelto lo anterior, procederemos a determinar si al calcular los ingresos que recibió la señora Llorens, por el arrendamiento de varios inmuebles de su propiedad y por la venta de ropa, debieron considerarse y descontarse como gastos necesarios para producir dichos ingresos aquellos informados por ésta en sus planillas de contribución sobre ingresos.

Sobre esta controversia, el artículo V(B)(1) de las Guías de 1989 indica que en el caso de quien trabaje por cuenta propia, el ingreso bruto se determinará: "por un **procedimiento similar** al que se utiliza en la planilla de contribución sobre ingresos en donde se toman en consideración los **gastos necesarios** en que el alimentante haya incurrido para producir su ingreso".[17] (Énfasis suplido.)

_____

[17] Las Guías de 2006, en su artículo 7 A (1) (b), disponen que "[e]n aquellos casos en que la persona custodia o no custodia ejerza una profesión, oficio o conduzca un negocio por cuenta propia, el ingreso bruto se determinará restando a la totalidad de los beneficios económicos obtenidos en el curso del negocio, profesión u oficio, los gastos necesarios en los cuales la persona haya incurrido para obtener tales beneficios". Nótese que las Guías de 2006 eliminaron la referencia específica al procedimiento de la planilla de contribución sobre ingresos. Torres Peralta

En virtud del citado artículo, la señora Llorens argumenta que para determinar los ingresos obtenidos del negocio de venta de ropa y del arrendamiento de bienes inmuebles, debieron reducirse aquellos gastos que el Código de Rentas Internas permite deducir para fines contributivos. Particularmente, alude a la sección 1023 (a) 1 del Código de Rentas Internas, 13 L.P.R.A. sec. 8423, la cual prescribe que al computarse el ingreso neto, para efectos de una industria o negocio, se admitirán como deducciones "[t]odos los **gastos ordinarios y necesarios** pagados o incurridos durante el año contributivo en la explotación de [dicha] industria o negocio. . .".

Al discutir el alcance del término "gastos ordinarios y necesarios", en el contexto contributivo, Manuel Tirado Viera expone que "la condición de 'ordinario y necesario' en un gasto ha sido una cuestión controvertible". Manuel Tirado Viera, *Fundamentos de las contribuciones sobre ingreso de Puerto Rico*, 2da ed., 1986, pág. 160. Por un lado, un gasto califica como "ordinario" si éste "prevalece en la comunidad como una práctica en la industria o negocio". *Íd.* De otra parte, un gasto califica como "necesario" cuando "ayuda en el desarrollo, fomento y continuidad de una industria o negocio". *Íd.* El criterio de necesidad no implica que el gasto deba ser indispensable para el funcionamiento del negocio, sino que es suficiente

---

expone que el lenguaje utilizado en las Guías de 2006 continúa siendo uno muy superficial. *Op. cit.*, pág. 846.

una "razonable conexión con el propósito de fomentar la industria o negocio". *Íd.,* págs. 160-161.

En aplicación del concepto de "gastos ordinarios y necesarios", las planillas de contribución sobre ingresos proveen una lista no taxativa para que los contribuyentes informen los gastos operacionales en los cuales han incurrido en el manejo de su industria o negocio. Torres Peralta discute que la enumeración de deducciones contributivas permitidas por gastos necesarios y ordinarios es una que se extiende "prácticamente *ad infinitum*". *Op. cit.,* págs. 8.47-8.51. Dicha lista incluye, entre otras, deducciones por: gastos de vehículo de motor, gastos de comida y entretenimiento, materiales, reparaciones, depreciación, reparaciones, anuncios, seguros, y gastos de viaje. *Íd.*

Algunas de las referidas deducciones podrían resultar superfluas o injustificadas en el contexto de la imposición de una pensión alimentaria. En ese tenor, Torres Peralta afirma que es insuficiente que cierto gasto se enumere en las planillas de contribución sobre ingresos, y sea informado en éstas, para que deba restarse al calcular el ingreso de un alimentante que trabaja por cuenta propia. *Íd.,* pág. 8.47. Antes bien, expone que sólo deben considerarse como gastos necesarios, en la fijación de una pensión alimentaria, aquellos "razonables" y "realmente incurridos". *Íd.* Coincidimos con tal criterio.

Ciertamente, las Guías de 1989 pautan que para determinar el ingreso bruto de un alimentante que trabaja por cuenta propia se seguirá un **"procedimiento similar"** al que se utiliza en la planilla de contribución sobre ingresos "en donde se toman en consideración los **gastos necesarios** en que el alimentante haya incurrido para producir su ingreso". Es decir, las Guías de 1989 indican que se acudirá, ilustrativamente, al procedimiento utilizado en las planillas de contribución sobre ingresos para fijar el ingreso bruto del alimentante, en los casos en que trabaje por cuenta propia.

Si bien el proceso que se sigue en el contexto contributivo es ilustrativo al momento de fijar el ingreso bruto en tales casos, ello no implica que un gasto informado en las planillas de contribución sobre ingreso deba reducirse automáticamente en el proceso de fijar una pensión alimentaria. Más aún cuando, en el contexto de fijación de pensiones alimentarias, está en juego el bienestar de los menores alimentistas.

Asegurar el derecho de los menores a recibir alimentos podría requerir una aplicación más restrictiva sobre lo que constituye un gasto necesario en el contexto de la fijación de una pensión alimentaria. Aunque el proceso establecido en el contexto contributivo sirve para ilustrar al foro primario —en la determinación de los gastos que pueden descontarse al establecer el ingreso bruto de quien trabaja por cuenta propia— el hecho de que un gasto sea deducible

en las planillas de contribución sobre ingresos no adjudica que dicho gasto sea uno "necesario" al fijar una pensión alimentaria.

De otra parte, la existencia del gasto invocado por quien está obligado a prestar alimentos es un asunto que debe ser objeto de prueba ante el foro que ostenta la ardua encomienda de fijar una pensión alimentaria justa y razonable.  Corresponde a dicho foro aquilatar la prueba presentada para determinar si, como cuestión de hecho, se incurrió en el gasto que se invoca.[18]

En síntesis, el foro adjudicador debe determinar si el gasto invocado es uno en el que realmente se incurrió y que, además, es uno necesario a la luz de las circunstancias del caso.  En cuanto a este último aspecto debe evaluarse si el gasto es uno en el que razonablemente se incurrió con el interés de fomentar la industria o negocio.  El proceso administrativo referente a las planillas de contribución sobre ingresos, y los gastos que

---

[18] En *López v. Rodríguez* mencionamos que al hacer la determinación sobre ingresos, para fijar una pensión alimentaria, también debe tomarse en consideración la economía subterránea que prevalece en Puerto Rico y "que el mayor grado de evasión [contributiva] proviene de personas con negocios propios, seguidos por varios grupos de profesionales y, finalmente por algunos contribuyentes asalariados".  *Íd.*, pág. 32, esc. 12, citando el *Informe del Secretario de Hacienda sobre Reforma Contributiva de 1987*, págs. 68-69.  En iguales términos, en *Argüello v. Argüello* expusimos que al fijar la cuantía de pensión "debe considerarse la economía subterránea que prevalece en Puerto Rico y que muchos profesionales y personas con negocios sólo declaran fiscalmente parte de sus ingresos reales".  *Íd.,* pág. 73.

allí se informen, no resultan obligatorios para el foro que debe fijar una pensión alimentaria.

En el presente caso, contrario a lo que argumenta la señora Llorens, el Tribunal de Primera Instancia no estaba obligado a reducir los gastos que ésta informó para fines contributivos. Tras examinar la prueba presentada, dicho foro determinó que procedía considerar el ingreso por venta de ropa sin restar los gastos informados por la señora Llorens en sus planillas de contribución sobre ingresos. Igualmente, decidió que sólo procedía restar algunos gastos referentes al arrendamiento de propiedades. Dicha determinación del foro primario bien pudo responder a que no entendió probados los demás gastos invocados por la señora Llorens o a que determinó que, a la luz de las circunstancias del caso, los referidos gastos no resultaban razonables.

El solo hecho de que la señora Llorens informara ciertos gastos en sus planillas de contribución sobre ingresos resulta insuficiente para que proceda intervenir con la determinación del Tribunal de Primera Instancia sobre este particular. El que no se presentara prueba adicional al respecto ante el foro primario, nos impide concluir que la señora Llorens incurrió en los gastos reclamados o que dichos gastos fueron razonables, a la luz de las circunstancias del caso. Ante tal escenario, la determinación del Tribunal de Primera Instancia merece nuestra deferencia. Consecuentemente, resolvemos que no

erró el Tribunal de Apelaciones al no intervenir con lo resuelto por el foro primario en cuanto a los gastos del negocio de venta de ropa y al arrendamiento de propiedades inmuebles.

IV.

Por último, examinaremos si debemos intervenir con la cuantía de honorarios de abogado concedida por el foro primario.

La imposición de los honorarios de abogado a favor de los menores, en una acción para reclamar alimentos a favor de éstos, procede sin la necesidad de que el demandado incurra en temeridad pues dicha partida es parte de los alimentos a los que tiene derecho el menor alimentista. *Guadalupe Viera v. Morell*, *supra*, pág. 14, y casos allí citados. *Véase además*, *Torres v. Carrasquillo, supra.* Mediante el artículo 22(1) de Ley Núm. 5, 8 L.P.R.A. sec. 521, se incorporó estatutariamente dicha norma jurisprudencial, al disponerse que en cualquier procedimiento referente a la fijación de una pensión alimentaria deberá "impon[érsele] al alimentante el pago de honorarios de abogado a favor del alimentista cuando éste prevalezca".

Así como la cuantía de los alimentos que se fije a favor del menor debe resultar razonable, de igual forma la partida correspondiente a los honorarios de abogado –que es parte de los alimentos a los que tiene derecho el menor alimentista– debe regirse por el criterio de la

razonabilidad. *Guadalupe Viera v. Morell, supra. Véase además, Torres v. Carrasquillo*, *supra.* Como consecuencia de ello, no procede intervenir con los honorarios de abogado que conceda el foro primario salvo que la suma concedida sea irrazonable.

Ciertamente, la extensión del pleito es un factor a considerar al fijar los honorarios de abogado a favor del menor alimentista. No obstante, éste no constituye un criterio único. Pueden existir otros factores, asociados al curso de los procedimientos y las circunstancias del caso en particular, que incidan en el criterio del juzgador en el ejercicio de establecer una cuantía de honorarios justa y razonable.

Luego de examinar el expediente ante nuestra consideración y analizar los trámites procesales acontecidos ante el Tribunal de Primera Instancia, no estamos en posición de intervenir con la cuantía de honorarios concedida por el foro primario. Confirmamos la determinación del Tribunal de Apelaciones a los efectos de que no procede alterar la suma de honorarios de abogado que el Tribunal de Primera Instancia estimó razonable a la luz de las circunstancias particulares y trámites acaecidos en el presente litigio.

V.

Tras resolver las controversias planteadas, y en virtud de los pronunciamientos que anteceden, modificamos la sentencia recurrida, en lo que es incompatible con lo

aquí resuelto. Devolvemos el caso al Tribunal de Primera Instancia sólo para que dicho foro calcule la pensión correspondiente al año 1997 excluyendo del ingreso de la señora Llorens los "$72,000 capitalizado por [el] refinanciamiento de dos inmuebles".

Se dictará sentencia de conformidad.


                              Anabelle Rodríguez Rodríguez
                                     Juez Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Eileen Llorens Becerra

    Peticionaria

       v.                              CC-2007-872

Ildefonso Mora Monteserín

    Recurrido

SENTENCIA

San Juan, Puerto Rico, a 12 de mayo 2010

    Por los fundamentos expresados en la Opinión que antecede, los cuales se incorporan íntegramente a la presente, modificamos la sentencia recurrida, en lo que es incompatible con lo aquí resuelto. Devolvemos el caso al Tribunal de Primera Instancia sólo para que dicho foro calcule la pensión correspondiente al año 1997 excluyendo del ingreso de la señora Llorens los "$72,000 capitalizado por [el] refinanciamiento de dos inmuebles".

    Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Rivera Pérez y la Jueza Asociada señora Pabón Charneco disienten sin opinión escrita.

Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo